Cleo CALAGE

v.

The **UNIVERSITY OF TEN-
NESSEE** et al.

Civ. No. 3–75–1.

United States District Court,
E. D. Tennessee, N. D.

April 21, 1975.

L. Caesar Stair, III, Charles D. Susano, Jr., Bernstein, Dougherty & Susano, Knoxville, Tenn., for plaintiff.

Ronald C. Leadbetter, John C. Baugh, Arthur B. Stowers, Jr., Daniel F. B. Rhea, Knoxville, Tenn., for defendants.

### MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This is an action arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5 *et seq.*, in which Cleo Calage alleges that she was unlawfully discriminated against because of her sex while employed by the University of Tennessee's Food Service Department from October 9, 1967 until November 1973. She claims that her treatment by the University was discriminatory in the following respects:

1. The University failed to grant her promotions during her employment because of her sex.

2. The University failed to pay her the same wages for the same work performed by males.

3. The University unlawfully maintained sex-based job classifications.

4. The University unlawfully discriminated against her in regard to certain fringe benefits.

It should be noted that the record in this instance fails to allege discriminatory hiring practices because of sex.

Although plaintiff's complaint originally requested declaratory and injunctive relief in addition to an award of back pay [1] and attorneys' fees,[2] at the hearing plaintiff's counsel dropped his request for injunctive relief. Sitting without a jury, the Court received evidence and argument in this case on March 12 and April 7, 1975.

Plaintiff filed a complaint with the Equal Opportunity Employment Commission on February 27, 1973 and received a right to sue letter on October 4, 1974.

Plaintiff, Cleo Calage, was hired by the Food Services Department of the University on September 13, 1967 as a catering supervisor. Formerly, plaintiff was employed at the Senator's Club in Knoxville as a catering manager from 1965 to 1967 and as a manager at the Oak Ridge Country Club in Oak Ridge from 1963 to 1965. Prior to 1963, plaintiff operated her own catering and food service business. It is evident that when plaintiff was employed by the University in 1967 she enjoyed considerable expertise in the catering business as a result of her practical experience. That plaintiff is eminently qualified in her area of food services was not an object of dispute during the hearing.[3]

During the school year 1966–67, prior to plaintiff's employment in the Fall of 1967, the University made a concerted effort to reorganize and upgrade its catering department, which prior to that time had been nearly nonexistent. In catering its own internal functions, the University prior to 1966 was forced to seek the services of outside commercial catering businesses. To head the formidable task of reorganizing the catering department, the University in the Fall of 1966 employed Mr. C. S. Pritchard as manager of the catering department. (Exhibit 1)[4] Prior to joining the University in 1966, Mr. Pritchard held a degree in public relations from Boston University, was a training consultant for Holiday Inns of America, manager of several country clubs, and acted as State Department consultant to Jordon where he trained citizens of that coun-

1. 42 U.S.C. § 2000e–5(g), 21 A.L.R. Fed. 472 (1974). *Meadows v. Ford Motor Co.*, 510 F.2d 939 (6th Cir. 1975). For a general discussion of sex discrimination in employment under the Civil Rights Act of 1964 see 12 A.L.R. Fed. 15 (1972); see also 7 A.L.R. Fed. 707 (1971).

2. 42 U.S.C. § 2000e–5(k). Through motion prior to the hearing, and by subsequent argument the University asserted as a shield the defense of sovereign immunity under the Eleventh Amendment both with respect to an award of back pay and assumably attorneys' fees. Although the resolution of plaintiff's case on the merits does not require the Court to address the sufficiency of this defense, the question of the University's status under the Eleventh Amendment appears to have been decided by the Sixth Circuit in *Soni v. Board of Trustees of University of Tennessee*, 513 F.2d 347 (6th Cir., 1975).

3. Support for this statement is found in collective Exhibit 17 which contains numerous letters of commendation from members of the University community. These letters speak for plaintiff's competency.

4. In the school year 1966–67, the Food Services Department was divided into five sections: Central Food Service (Food Purchasing), Temporary Cafeteria (Food Services), Catering (Food Services), U. T. Center (Food Services), and Dietitian. (Exhibit 1) Generally, during the years in question, each section contained two managerial classifications, manager and supervisor, in addition to the classification assistant manager found in some sections. In turn, each section's manager was responsible to the Department's Director. An Associate Director was introduced for the first time in the school year of 1969–70. (Exhibit 4) Thus, in ascending order the chain of command generally followed the pattern of supervisor—assistant manager—associate director—director.

try in food service techniques. Mr. Norman Hill, present director of the Department, stated that it was his understanding that Mr. Pritchard was hired in 1966 explicitly because of his qualifications both in the food services area and the public relations area.[5] Pritchard during the school year 1966–67 was paid $8,200.00 as manager of catering. (Exhibit 1)

In the Fall of 1967, plaintiff was employed as catering supervisor and as such was responsible to Pritchard who in 1967–68 remained as manager of the catering section. As supervisor under Pritchard plaintiff received $5,200.00. (Exhibit 2) It is not entirely clear whether in 1967–68 the catering section was still in the developmental stage or if the section was essentially an established and ongoing program.

A "Performance Rating Report for Food Service Workers" dated 5–1–68 and completed by Pritchard appears to have rated plaintiff very high in all areas of competency. (Exhibit 18)

In the Fall of 1968, Pritchard was transferred to the U. T. Center as Manager of that building's student food services (Cafeteria and Grill), creating a vacancy in his former catering position which plaintiff assumed. (Exhibit 3) Plaintiff contends that in 1968 she in fact if not in title assumed the former position of Pritchard as manager of catering for which she should have been paid an equal salary of $8,200.00 instead of the $5,800.00 [6] she received in 1968–69 for ostensibly the same work. Plaintiff also claims that while the organizational chart of 1967–68 (Exhibit 2) carried as a separate unit "catering" with Pritchard listed as the manager of that unit, when she assumed Pritchard's duties in 1968–69, the organizational chart for that year (Exhibit 3) deleted

the catering unit and she appeared as catering "supervisor." Plaintiff claims this change in the Department's organizational chart is more than a semantic formality but rather constituted an overt act of sex discrimination. Plaintiff, in addition to operating the Department's catering unit in 1968, assumed the responsibility of managing the Hermitage Room, a relatively small self-service cafeteria in the University Center reserved for administrative and faculty personnel and graduate students. Plaintiff stated that during her tenure as head of the catering unit she was directly accountable to the Department's Director, was not responsible to any intermediary manager as depicted on the organizational charts (Exhibits 3–16) and, therefore, in fact, if not in title, was a manager.

A performance rating report of plaintiff dated 2–4–69 completed by Pritchard listed her as an assistant manager. This report was similar in form and content to the 1968 evaluation and was generally of a commendable tenor. (Exhibit 18)

Exhibit 4, the Department's Organizational Chart for 1969–70, reflects that during that year plaintiff's title was changed by the University from Supervisor to Assistant Manager at the U. T. Center in charge of catering. Plaintiff, however, contends that she continued in Pritchard's former position in addition to her Hermitage Room duties and continued to receive an unlawfully disparate salary of $6,600.00 as compared to Pritchard's 1967–68 salary of $8,700.00. Plaintiff in addition to noting the wage disparity during the year 1969–70 as between her and Pritchard's former salary, claims that she was not considered for any of the promotions that were made in the Fall of 1969 because of her sex. Her evaluation for that year con-

---

5. Evidently, bettering of the relationship between the catering department and University community was an objective in the recruitment of Pritchard.

6. Plaintiff's salary progressed as follows for the time in question: 1967–68—$5,200.-00; 1968–69—$5,800.00; 1969–70—$6,600.-00; 1970–71—$7,100.00; 1971–72—$7,-800.00; 1972–73—$8,100.00; 1973–74—$8,-300.00. (Exhibits 1–13)

ducted by Pritchard, which indicates to some extent that Pritchard and not the Director was her supervisor, dated 2–70 essentially reflects the same favorable report as her two prior evaluations. (Exhibit 18)

Turning to the organizational chart of 1970–71 (Exhibit 7), plaintiff points toward the fact that of the six assistant managers, including two females (plaintiff and Booker), two male assistants made more than she.

Plaintiff's "Employee Performance and Career Appraisal" evaluation form for the 1970–71 year dated February 5, 1971 indicates two things. First, plaintiff's evaluator was Mr. Bernhard, Manager of the U. T. Center, indicating that plaintiff worked *under* the supervision of a manager to some extent and, secondly, there appears to be a significant drop in plaintiff's overall evaluation from the previous years' remarks of high commendation. (Exhibit 18)

On the 1971–72 organizational chart plaintiff notes that of five assistant managers, three males and two females (including plaintiff), one male assistant was paid more than she. Likewise, two male and one female assistants were paid less than she. (Exhibit 9) The February 1972 evaluation of plaintiff by Mr. Bernhard evidences a further decline in her performance. Unlike the Satisfactory/Outstanding evaluation of February 1971, the 1972 evaluation fluctuates between Satisfactory/Improvement Needed. (Exhibit 18) The results of an accompanying numerical evaluation are similar.

The developing friction between plaintiff and her superiors kindled in January 1973 when the Food Services Department removed the Hermitage Room from plaintiff's responsibilities. The contents of Exhibit 21, however, indicate that this decision was the end product of a considered decision made in the best interest of the Department's internal administration and was not the result of sex discrimination. Plaintiff filed a charge of sex discrimination with the E.E.O.C. against the University on February 27, 1973. Plaintiff's February 1973 evaluation signed by Hill and Norris is somewhat less than commendable.

In the Fall of 1973, plaintiff, in providing certain time sheets to the University, was requested by her superiors to indicate by her signature whether she devoted over 20 per cent of her time to nonsupervisory duties. This requirement was to enable to the University to either include or exclude plaintiff from applicable wage laws. As a result of plaintiff's failure to indicate her inclusion or exclusion from the wage laws on her time sheet, and, after formal demand for such indication by her supervisor, plaintiff was dismissed from her employment with the University on November 16, 1973. Exhibit 25 demonstrates to the Court that considerable effort was made on the part of the University to resolve this problem of exemption with plaintiff prior to her termination. In the opinion of the Court, her dismissal from the University was not based upon her sex. The record in this instance is completely void of any evidence indicating the plaintiff's discharge was predicated upon any factor other than her failure to provide information needed by the University and to which it was entitled. Plaintiff did not claim in her testimony that sex entered into her discharge.

Plaintiff, in addition to citing the wage disparity existing between herself and her male predecessor, Pritchard, between herself and other male assistant managers, and her lack of promotion, throughout the course of the hearings in this case sought to prove evidence of departmental sex discrimination, that is, wage disparities as between males and females other than herself. In attempting to establish an overall pattern of sex discrimination, based principally on wage disparity, plaintiff tendered Exhibit 26 consisting of an annual salary comparison between the sexes at the Director, Manager and Supervisor levels.

Also, through Exhibits 1–16 plaintiff attempted to show on a yearly basis that promotions to upper level positions typically went to males.

At the April 12 hearing in this case, plaintiff testified, after which Mr. Norman Hill, present Director of the Food Services Department, and Mr. Robert Norris, present Manager of the U. T. Center, testified. The focus of the April 12 hearing was on the comparative duties and skills of Pritchard and plaintiff. While the Court was satisfied at the conclusion of the April 12 hearing that the record was sufficiently developed to determine whether the wage disparity between plaintiff and Pritchard could be justified on nonsexual grounds, it was not satisfied that the record was sufficiently developed to explain the departmental disparities found in Exhibit 26. The Clerk of the Court informed the University of the Court's desire for a more complete record and thereafter, accompanying its post-trial brief, the University submitted the affidavit of Mr. Hill. Unable to obtain a stipulation from the parties regarding the content of Mr. Hill's affidavit, the Court reopened the case for the receiving of additional evidence on April 7, 1975. At this subsequent hearing Mr. Hill testified as to the preparation and contents of his March 18 affidavit. Plaintiff then cross-examined Mr. Hill and introduced the testimony of Mary Poston, presently the Manager of Strong Hall.

The affidavit of Mr. Hill consists of two exhibits, "A" and "B". Exhibit A is a comparative evaluation in terms of annual sales, number of meals served, number of employees and type of service of each unit in the Food Services Department for every academic year from 1966–67 to 1972–73. Exhibit B is likewise an "explanation of salary discrepancies between males-females with same title in same unit." This latter exhibit is also divided into years.

Plaintiff and Poston's April 7 testimony sought to rebut Exhibits A and B with the comment that in their opinion in almost every case a female was superior to a male.

██ Under Title VII the plaintiff carries the "initial burden under the statute of establishing a prima facie case of . . . discrimination." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L. Ed.2d 668 (1973). Having reviewed the record in the case and having observed the witnesses, the Court is of the opinion that defendants have not violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5 *et seq.* The overwhelming evidence demonstrates that any wage disparity between plaintiff and other males and her lack of promotion were founded entirely on factors other than her sex and her status as a woman had no bearing on the Department's actions toward her.

While not wishing to adjudge the professional capabilities or performance of either plaintiff or Pritchard in food services, it is evident that Pritchard in 1966 possessed higher qualifications than plaintiff and, while plaintiff may have assumed a greater work load with the assumption of her duties at the Hermitage Room at the University Center in 1968, her work as head of the catering department, whether denominated by the University as supervisor, or manager by plaintiff, was of a substantially different nature from 1968 to 1973 than Pritchard's job was from the Fall of 1966 until transferred in 1968. Pritchard was hired for and charged with the responsibility of developing from the ground floor a viable and self-sufficient catering department and his singularly unique background equipped him for this task. Not until this department had undergone considerable evolution did plaintiff assume the responsibilities of managing the department; however, by that time the catering department was an established entity due to the efforts of Pritchard. It was an ongoing rather than developing service. The skills and demands were different and, accordingly, in the opinion of the Court,

justified the wage disparity between plaintiff and Pritchard. Thus, the amount or degree of skill required to perform Pritchard's job in 1966 to 1968 when he developed the catering program were substantially different from those of plaintiff when she assumed the position in 1968.

Plaintiff in the form of Exhibits 1–16 and 26 sought to establish a prima facie case of sex discrimination by showing that women and men of the same managerial title were paid disparate salaries. *See Reed v. Arlington Hotel Co.,* 476 F. 2d 721, 723 (8th Cir. 1970); *Spurlock v. United Airlines, Inc.,* 475 F.2d 216 (10th Cir. 1972).

As a threshold observation, the Court notes that throughout the course of the hearing plaintiff has contended that in examining two managerial jobs of equal title or position on a schematic sketch of the Food Service Department's managerial heirarchy (see Exhibits 1–16), that is, one managerial position in one unit being on the same level as another managerial position in another section, that any differential must automatically be attributed to sex. Thus, under plaintiff's theory, a manager of the U. T. Center Food Service must receive the same pay as the manager of the Presidential Court Food Service and a supervisor in the University Center must receive the same as a supervisor of Presidential Court. In essence, equal placement on an organizational chart demands equal pay. Such a position necessarily rejects the traditional variables that are injected into a determination of salary such as seniority, experience, credentials, job complexity, mental or physical stress, management skills, etc. While plaintiff suggested indirectly that such variables are essentially judgmental and provide a readily available artifice for what in fact may amount to sex dis-

crimination, the Court is not unaware of such likelihood.

█ In determining the legality of a male-female wage disparity under the Civil Rights Act of 1964, such as that evidenced in Exhibit 26, the Court is mindful of the relationship between the Civil Rights Act, Title VII and the Equal Pay Act, 29 U.S.C. § 206(d); more particularly, 42 U.S.C. § 2000e–2(h), which provides:

> " . . . [I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, . . . It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29."

The Court is of the opinion that the applicable Acts and their case law construction reject plaintiff's rigid theory that equal title demands equal pay. The law is not so inflexible or unrealistic. Rather, under the applicable law the Court in adjudging the lawfulness of a wage disparity must look to "the job as a whole," [7] and that "[t]he controlling factor under the Equal Pay Act is job content—the actual duties that the respective employees are called upon to perform." [8] Job content and not title are thus determinative.

---

7. *Wirtz v. Basic, Inc.,* 256 F.Supp. 786 (D. C.Nev.1966).

8. *Hodgson v. Brookhaven General Hospital,* 436 F.2d 719, 724 (5th Cir. 1970); cf. *Shultz v. Kimberly-Clark Corp.,* 315 F.Supp. 1323 (W.D.Tenn.1970).

Turning to Exhibit 26 and the affidavit of Mr. Hill, the Court initially recognizes that there exists some question as to the validity and accuracy of plaintiff's figures in Exhibit 26 since a certain managerial population was omitted, namely the dietitians. Defendants contend that inclusion of this unit would reduce any reported disparity. The Court need not pass on whether this omission is critical since it is of the opinion that defendants' explanation of any disparity, through the testimony and affidavit of Hill, is sufficient to overcome any presumption in plaintiff's favor. It is significant in this regard that plaintiff at no time charged the University with sex discrimination in hiring.

Exhibits A and B to Hill's affidavit indicate a rough approximation exists between the amount of annual sales, number of meals served and number of employees and the individual manager's salaries for the years in question. For example, in 1968–69 the following information is found:

|  | Annual Sales | Number of Meals Served | Number of Employees | Type of Service |
|---|---|---|---|---|
| University Center (Pritchard–M–$9,900) |  |  | 96 |  |
|     Cafeteria | $363,591 | 409,567 |  | Cafeteria |
|     Grill | $177,617 | 194,906 |  | Grill |
|     Hermitage Room (Plaintiff– F–$5,800) | $ 29,488 | 38,875 |  | Cafeteria |
|     Catering (Plaintiff– F–$5,800) | $115,086 | 88,527 |  | Table Service |

The Court recognizes that the above factors were not alone determinative in establishing a managerial salary but instead were significant criteria. Additional factors such as seniority, educational qualifications and personal evaluation were also relative factors. For example, Exhibit B reflects the following differential in salary and the corresponding qualifications in the case of two female supervisors at U. T. Center in comparison to two male supervisors.

"At the *U. T. Center* two male supervisors with superior backgrounds received higher salaries than two female supervisors without comparable backgrounds. One male, Cantrell, who had been a district manager of Kentucky Fried Chicken Corp., was hired as a food production supervisor. The second male, Bernhard, had a degree in Hotel and Restaurant Management from Cornell University and had experience with the military in club management. The two female supervisors Calage and Roland were responsible for catering and the Hermitage Room and performed functions considerably less complex than the supervisors in charge of the University Center."

Similarly, Exhibit B indicates that in each case where a male made a higher salary than a female of equivalent title, the reason lay in either the broader managerial experience of the former or the nature of the position's responsibilities. The Court notes that there are likewise instances in Exhibits 1–16 where males earn less than females of equivalent title. The Court is of the opinion that the University in this case has attempted to make a good faith determination of salary based upon job complexity, responsibility, educational

and managerial credentials, seniority and job performance and not on a person's sex. While, as noted above, any salary calculation involves a judgmental decision, there is no evidence in this record that such judgment has given way to bias. The Court cannot say that the reasons set forth in Exhibit B for salary differentials constitute an artifice for sex discrimination.

Plaintiff claims that she and other females were denied promotions because of her sex. Plaintiff specifically points to the fact that a female has not occupied the position of Manager of U. T. Center since approximately 1966. The Court, however, understands that a female did occupy that position before that time.

With respect to plaintiff in particular, Exhibits 22 and 23 indicate that females who received higher evaluations than plaintiff, Miller and Poston, respectively, did receive promotions to managers and that they also received higher salaries than plaintiff. The Court can only construe these exhibits to show that females did in fact receive promotions to management positions in recognition of their high evaluations.

■ Turning to a broader level, the Court observes that this is not the case where women are totally absent from managerial positions or constitute a very small segment of the total work force. Thus, Exhibits 1–16 show the following:

| | Female Managers | Male Managers |
| --- | --- | --- |
| 1967–68 | 1 | 4 |
| 1968–69 | 2 | 3 |
| 1969–70 | 2 | 3 |
| 1970–71 | 4 | 2 |
| 1971–72 | 3 | 2 |
| 1972–73 | 3 | 3 |
| 1973–74 | 3 | 3 |
| Total | 18 | 20 |

The Court cannot turn its back to the above figures which go a long way in disproving plaintiff's contention that the Food Department at U. T. is a man's world. "[I]t is not automatically and axiomatically true that just because a particular plant employs both men and women the latter are discriminated against." *Palmer v. General Mills*, 375 F.Supp. 817, 821 (N.D.Ohio 1974). The above figures do in fact indicate that women were able to occupy top management positions in the Food Services Department and that progression was not a rarity. Additionally, there exists little cogent evidence in this record that plaintiff ever complained of sex discrimination until after the Hermitage Room incident.

In summary on the basis of Exhibits 1–16, 26, the evaluations of plaintiff and other females, and the affidavit of Mr. Hill, the contents of which were verified by the oral testimony of Mr. Hill at the April 7 hearing, the Court is of the opinion that plaintiff was not the object of unlawful discrimination under Title VII of the Civil Rights Act.

Accordingly, it is ordered that plaintiff's action be, and the same hereby is, dismissed.