**Lynnette E. GRAHAM, Plaintiff,**

v.

**TEXASGULF, INC., and Elf Aquitaine, Inc., Defendants.**

**Civ. No. B–85–479.**

United States District Court, D. Connecticut.

June 18, 1987.

---

Judith P. Vladeck, and David Bruce Goldin, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff.

Gary A. MacMillan, Margaret A. Sheahan, Cummings & Lockwood, Stamford, Conn., for defendants.

## AMENDED MEMORANDUM OF DECISION

DALY, Chief Judge.

Plaintiff, Lynnette E. Graham, brought this action against the defendants Texasgulf, Inc. and its parent, Elf Aquitaine, Inc., to remedy alleged sex discrimination in employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), and to remedy alleged breach of contract and failure to pay wages upon termination of employment. In advance of the trial before the Court the parties submitted proposed findings of fact and conclusions of law. The Court is compelled to note that these submissions are less than comprehensive in setting forth the applicable case law in an area that is not infrequently litigated. After the submission of the plaintiff's case the plaintiff voluntarily dismissed her claim of failure to pay wages upon termination. Defendant then moved pursuant to Fed.R. Civ.P. 41(b) to dismiss plaintiff's remaining claims. That motion was granted.*

---

\* The original Memorandum of Decision in this matter was filed on December 19, 1986. Although in its initial ruling from the bench the Court had dismissed the breach of contract claim, the Court mistakenly indicated in the original Memorandum of Decision that the breach of contract claim had been voluntarily withdrawn. The error was not brought to the attention of the Court until sometime after the plaintiff appealed the entire Ruling to the Court of Appeals. Upon the consent of the Court and each of the parties, the matter has been resubmitted to the Court pursuant to Fed.R.Civ.P. 60(b), so that this Amended Memorandum of Decision, which now includes the Court's disposition of the third cause of action for breach of contract, may issue.

## FINDINGS OF FACT

The Plaintiff, Lynnette E. Graham ("Graham"), is a female and a native and citizen of Australia who, for the most part, has resided in the United States and Canada since 1976. After receiving a Bachelor of Laws degree from the University of Sydney in 1967 she was admitted to practice as a solicitor in Australia and practiced there until 1975.[1] While a practicing solicitor, Graham engaged in a variety of legal work, including real estate and mortgage, corporations, leases, negotiations, as well as the processing of loans. In 1976 Graham moved to New York with her husband and enrolled in a post-baccalaureate law program at New York University Law School from where she received a Masters of Law degree in tax in 1977. Following her graduation from that program she commenced a job search which led her to W.H. Eolis, Inc., an attorney placement firm known for its placement of female professionals.[2] Eolis referred Graham to the Law Department of the defendant, Texasgulf, Inc., located in Stamford, Connecticut. At that time, Texasgulf was soliciting applications for an attorney to specialize in tax law.

Texasgulf is a Delaware corporation whose principal place of business is Stamford. It is primarily engaged in the development and production of chemicals, metals, and energy sources. Texasgulf enjoyed relative prosperity until the early portion of this decade at which time a variety of internal and external events precipitated a marked decline in its business. One of these events was the tragic crash of an airplane carrying virtually all of the members of the top management of Texas-

---

1. Unlike the customary requirements for obtaining a law degree in the United States, Graham had received only a high school education and not an undergraduate degree prior to her entrance to her law school curriculum.

2. When soliciting applications for employment, Texasgulf normally engaged the William H. Clarke attorney placement firm, or other firms with whom an agent of Clarke, Bill Bryan, might be associated.

gulf. Another series of events, manifested by a marked decline throughout the industry, caused a drop in prices as well as an overall weakening of Texasgulf. This fortuitous posture made Texasgulf ripe for acquisition, and in 1982, the defendant, Elf Aquitaine, also a Delaware corporation with its principal place of business in Stamford, acquired Texasgulf.

In 1977 the Texasgulf Law Department was comprised of attorneys in Stamford working at the corporation's headquarters, and attorneys working at the sites of the corporation's operations in Raleigh, North Carolina, and Houston, Texas. At the time, and throughout the events in question, Earl Huntington ("Huntington"), the Vice President and General Counsel, was the head of the Law Department. There were several other attorneys who worked with him in the Stamford office, including Charles Wilder ("Wilder") who was Assistant General Counsel. Each of the attorneys in the Stamford office had been hired to perform a primary function in a particular field of law such as patent, antitrust, tax, corporate, international, or natural resource exploration. Although the Law Department retained outside counsel when court appearances were necessary, they had all, except for Graham, been admitted to the bar of at least one jurisdiction within the United States.[3] Each attorney besides Graham had also completed at least several years of work experience in the United States that was associated with the primary function they were to serve at Texasgulf. *See* Plaintiff's Exhibits 8–15 (resumes of the members of the Law Department).

In 1977, tax matters in the Law Department were under the auspices of Meredith Crawford ("Crawford"), who at the time held the position of Senior Counsel. After consulting with the other members of the Law Department a decision was reached by Huntington to hire another attorney who specialized in tax matters to assist Craw-

ford. For a variety of reasons Huntington decided that it would be in the interest of the corporation to seek affirmatively to hire a female. Among these reasons was the fact that no female had yet been employed in the Law Department. Wilder thought the position of tax counsel particularly appropriate for a female because it was a quasi-scholarly braintrust position which did not require a lot of "wandering in the wilderness" that might be required of counsel for mining matters. Crawford was also amenable to the hiring of a female assistant.

Texasgulf then employed Eolis, a deviation from its normal practice when soliciting applicants, demonstrated by the fact that only one female was known to have been interviewed by the Law Department between 1970–1975. During the course of her two interviews at Texasgulf, Graham was asked questions with regard to her Australian credentials, her opinion about the proposed Equal Rights Amendment, and her marital status. Sometime after the interviews of Graham and several other candidates, Huntington called Graham and offered her the position as Counsel for tax matters. Before accepting, Graham was informed that she was to wear skirts to work rather than slacks, and she was asked to use her marital surname in her profession.

Graham commenced work at the Law Department in January, 1978, primarily as assistant to Crawford. In addition to tax matters, Graham eventually assumed duties which involved employee benefits and certain leasing arrangements. Graham continued in that position until early 1981 when, following the death of Crawford, she was promoted to his former position as Senior Counsel. She moved into Crawford's old office where she eventually assumed all of his old duties including treasury matters. Besides Crawford's death, the need to make personnel shifts required

---

**3.** At the time of her interview Graham had indicated that she intended to seek admittance to the New York Bar. Prior to taking such action, however, Graham apparently learned of a rule change that required an undergraduate baccalaureate degree in order to be admitted upon motion. Graham considered making a hardship application but never submitted such an application and never was admitted.

Graham to assume these added responsibilities.

Until the last several weeks of Graham's tenure at Texasgulf it appears that she performed well and maintained a harmonious and close relationship with most of her colleagues. Each attorney's performance was periodically evaluated and rated by his or her supervisor. Whatever rating system was used, Graham consistently received high scores, often higher than the scores of most of her male colleagues.

Graham's attendance record was good except for involuntary absences on two occasions. On one of those occasions it was necessary to reassign one of Graham's projects to Andrews, another member of the Law Department. On the other occasion, Graham either worked out of her home or came into the office on a part-time basis over the course of a few months. Wilder had no concern of any relapses of the illnesses that caused these absences, but there was some concern of some side effects that she had suffered (*i.e.*, a lower energy level and a loss of concentration).

The untimely loss of top management, as well as a period of economic decline in the marketplace precipitated drastic organizational changes and at least three personnel reductions at Texasgulf. The first change was marked by the acquisition of Texasgulf by Elf Aquitaine.

In December, 1981 the Law Department consisted of the General Counsel, the Deputy General Counsel, and seven other attorneys who had the title of Senior Counsel. In January, 1982 one of the two Counsels who had been assigned to environmental matters left voluntarily. In April, 1982 Texasgulf initiated the first work force reduction that effected the Law Department. Although no one was laid off, there were some reassignments. For one, Lowell Williams, the Senior Counsel assigned to International matters at the Stamford office was reassigned to the Paris office of Elf Aquitaine's parent company, Societe Nationale Elf Aquitaine. Shortly thereafter, Gordon Andrews, the Senior Counsel who, prior to the takeover, had been assigned to corporate and securities regula-

tion, was reassigned the legal work of a subsidiary of Elf Aquitaine headquartered in New Jersey. This reassignment forced Andrews to virtually relocate to that office. Consequently, Graham was forced to assume some of Andrew's duties that related to certain financial matters.

Graham was also involved in this work reduction at Texasgulf in that she prepared a memo to those members of the Texasgulf staff who were to be laid off which explained employee and severance benefits. Included in this memo was the statement that some severance benefits were conditioned upon the signing of a release. Incidentally, when asked to sign a similar release upon her own departure, Graham refused.

In the Fall of 1982, the second reduction in force occurred at Texasgulf which directly affected the Stamford headquarters staff. The Elf Aquitaine official charged with the supervision of Texasgulf, Michel Schneider-Maunoury was persuaded to prevent a reduction from directly impacting upon the Law Department. This proved only a short reprieve for the Law Department, for in the Summer of 1983 yet a third reduction in manpower was underway. This reduction was in conjunction with a corporate reorganization and decentralization plan. As part of this plan attorneys would be reassigned, if feasible, to the same location as the client for whom they did the bulk of their work. Consequently, Andrews made a complete transfer to the subsidiary in New Jersey. William Strait, the Senior Counsel in charge of exploration, development, and public land work for Texasgulf Minerals and Metals, faced with the choice of transfer to that client's base in Colorado, or a transfer to either Houston or Raleigh, or resignation, chose the transfer to Colorado. By doing so, he was able to maintain his long working relationship with his client there, Mr. Kurtz.

Also as part of the third reduction, the General Counsel was directed to further reduce the active Stamford legal staff to only three attorneys by discharging the

patent Counsel and one other.[4] Since Huntington had decided that neither his job, nor that of Wilder would be eliminated, the last person to be discharged would be either Graham or Eugene McGuire ("McGuire"). When hired as Counsel in 1979, McGuire was a member of the New York Bar and had been an accomplished litigator with nine years experience primarily in antitrust, and contract, corporate and securities matters. His primary function at Texasgulf was antitrust, commercial law and litigation; work that had previously been undertaken by Huntington and Wilder. His antitrust work was of paramount importance and he performed it well both before and after Graham's departure. By 1983 McGuire's duties had increased to include aircraft operation and all matters that related to the air crash. At the time of Graham's discharge, the air crash matter was in a discovery stage.

On July 26, 1983, a meeting of the corporate staff at Texasgulf was held where all were informed of the need for the third reduction in personnel. A short time after the meeting, Graham was summoned to a private meeting with Wilder and Huntington where Graham was informed that she would be discharged from Texasgulf on October 31, 1986. As a condition of her discharge, Graham was told that she could continue to work through October, and possibly on a consulting basis thereafter. If she signed a release, she would also be entitled to severance benefits. Although the decision was initially characterized as a "judgment call," the factors that formed the basis of the decision were eventually articulated for Graham. Among the factors she was advised of were the number of her absences; her failure to seek or gain admission to a bar; and the relative ease with which her pending work could be reassigned. The Court finds the last factor the most significant and has already discussed the factual basis for the first two.

Although Graham's primary expertise was in tax matters, most of her work at the time of her notification of discharge was in the areas of finance, employee benefits, and the Special Project Unit. Furthermore, the needs of the Law Department for a tax specialist had been obviated by the increased activity of the Tax Department and the appointment of a Vice President for taxes at Texasgulf. The Tax Department had been functioning as an entity separate from the Law Department without any substantial input from Graham for several years. Should the Tax Department need any assistance from the Law Department after the departure of Graham, it could be handled by the General Counsel, himself a tax lawyer with litigation experience. The finance legal matters could be handled by the Deputy General Counsel and the remaining Senior Counsel, McGuire, both of whom had experience in this area and had handled similar matters while at Texasgulf. Employee benefits work could be assigned to the Deputy General Counsel who had had the responsibility before Graham's hire, as well as the General Counsel, who also had experience in this area.

The Special Projects Unit at Texasgulf, based in Colorado, normally handled joint ventures and acquisitions. Its purpose at Texasgulf was soon to become obsolete and disbanded as a result of the reorganization that was underway. This foreclosed a transfer of Graham to Colorado as had been done for Strait[5].

Disgruntled, Graham commenced a campaign of both pursuing a more definite explanation, and protesting her discharge. By memo she demanded, and was granted a meeting with Huntington and Wilder on August 30. Again Graham was apprised of the reasons for her discharge. Having learned of a resignation that might have

---

**4.** At the time of his discharge, Huntington recommended that Dennis Polyn, the patent Counsel, be interviewed for a staff patent position then open at the New Jersey subsidiary. After competitive interviewing, the position was offered to, but declined by Mr. Polyn who worked at Texasgulf through October, 1983, and on a consulting basis for a week thereafter.

**5.** Even had Graham been offered a transfer, she might not have taken it since her application for employment indicated that she was not amenable to transfer.

made the creation of a new position in the Tax Department feasible despite the work force reduction, the General Counsel asked Graham if she would be interested in such a position if there would be no change in salary. Graham requested and received a proposed job description for the "Tax Counsel" position. It described the position as one that would involve the preparation of tax returns, work that Graham had never done as a professional. In turn, Graham submitted her own proposed alternative job description in a memo to the General Counsel on September 2. She proposed that a "Special Counsel to Chief Financial Officer" position be created for her, that a written employment contract be entered, and that her salary be set at a particular comparative standard (one by which she would be paid more than anyone in the Law Department who had less seniority and without regard to prior experience). The memo stated that her proposition was not negotiable and requested a meeting to discuss the matter upon her return from vacation. The tone of this letter was the first indication to the defendants that Graham perceived she was being treated unfairly[6]. This tone of protest was again expressed in a memo to Schneider-Maurnoury apprising him of these events in the Law Department. After sending the memo, Graham told Huntington that she had sent a memo "upstairs," which caused a sense of betrayal and disloyalty amongst her peers in the Law Department.

Because Graham had demanded more responsibility than the "Tax Counsel" position would require, and made what they perceived as an unreasonable pay demand, Huntington and Wilder met with Graham and rejected her proposal. Again during this meeting she was advised of the reasons for her discharge. Also discussed was the orderly transition for her departure. With regard to this, Graham was advised that all of her future business activity would be monitored by Huntington and Wilder. Such monitoring would in-

volve approval of outgoing correspondence and the reporting of any phone calls that pertained to her pending matters. By memo Graham informed them that she would refuse to comply with this directive. She testified that her reason for not complying was her intention to keep the files up to date before leaving and such a demand had never been made of anyone else[7].

After being notified of her discharge, Graham's conduct and attitude at the Law Department created a tense atmosphere. This manifested itself in the way Graham isolated herself from her colleagues with whom she was once close and collegial. In fact, after receiving notice, Graham informed McGuire, with whom she was close, that he would have to keep his distance from her because she was involved in "delicate negotiations," and she was going to make a lot of "noise" at Texasgulf. The perceived tension caused by Graham's conduct led Huntington and Wilder to order Graham's immediate dismissal on September 19, rather than October 31. Though no consulting arrangement was ever pursued, she was to be paid through the end of September.

Graham had never spoken to Huntington about salary, but it was the practice of Texasgulf to base a starting salary of an attorney in the Law Department on several factors, which included the candidate's potential value to clients, relevant experience, educational background, prior salary, and market rates. This system resulted in some attorneys starting at a higher wage than others. The discrepancy was not just among Graham and her male colleagues, but among the males as well. One example of the way a salary determination worked is to compare Graham and McGuire when they were first hired. First, McGuire had been hired later than Graham when the market rate for attorneys had increased. Second, Texasgulf considered McGuire's nine years of prior experience as an anti-

---

**6.** Between the date she was notified of her discharge, and the time of her actual departure, Graham made no reference to an intention to sue.

**7.** At this time Graham had no matters pending that pertained to her primary function as tax specialist.

trust litigator more valuable to the company than Graham's prior experience in real estate and general practice matters in Australia would be to the company in her position as tax counsel.

During her tenure, attorneys in the Law Department received consideration for merit salary increases annually on the anniversary of their employment, and on occasion, at other times. This remained true except for approximately a twelve month period of salary freezes which began in 1982. When the freeze ended in the Spring of 1983, consideration of salary increases did not await anniversary dates. Graham received salary increases on January 1 of each year from 1979–1981, and when her title changed to Senior Counsel, July 1, 1982 and April 1, 1983. Her final salary increase brought her annual salary to $50,-000.

Besides annual raises, attorneys were also eligible for salary increases that were awarded on the basis of the usefulness of the attorney to the client, knowledge of the law, their ability to work with others, and their overall performance ratings. When Graham was promoted to Senior Counsel, her performance was considerably higher than her salary would indicate. Consequently, she received an accelerated pay raise. Other benefits and stock options were made available to Graham and her colleagues throughout her employ.

## CONCLUSIONS OF LAW

 For purposes of Title VII, the plaintiff is an "employee" as defined in 42 U.S.C. § 2000e(f) and the defendants Texasgulf and Elf Aquitaine are "employer[s]" as defined in 42 U.S.C. § 2000e(b). All other conditions precedent to jurisdiction, including exhaustion of administrative remedies, have been met. *See Leveen v. Stratford Housing Authority*, 629 F.Supp. 228, 231–32 (D.Conn.1986). Plaintiff has chosen to pursue her Title VII claims under a theory of disparate treatment, *see McDon-*

*nell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973), rather than under a theory of disparate impact or effect, *see Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In Title VII cases a trifurcated inquiry is appropriate:

> First, the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Meiri v. Dacon*, 759 F.2d 989, 994 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), *quoting, Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), *quoting, McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824. The order of proof need not be rigidly compartmentalized, *McCluney v. Jos. Schlitz Brewing Co.*, 728 F.2d 924, 926 (7th Cir.1984), but rather, the *prima facie* case, the employer's rebuttal, and proof of pretext should be treated as if they are interdependent. *Meiri*, 759 F.2d at 997 n. 12[8]. The same evidence offered by the plaintiff to establish the *prima facie* case may also be put forth, where appropriate, by the defendant in rebuttal.

 Under this approach a *prima facie* case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), *citing, Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97

---

**8.** A *prima facie* case as used in the context of Title VII, refers to the "establishment of a legal mandatory, rebuttable presumption," rather than "the presentation of enough evidence to permit the trier of fact to infer the fact in issue." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1094 n. 4, 67 L.Ed.2d 207 (1981).

S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977). Not until all legitimate reasons for Graham's discharge and salary level have been eliminated as possible reasons for defendants' actions may it be assumed more likely than not the defendants based their decisions on an impermissible consideration such as gender. *See Waters*, 438 U.S. at 577, 98 S.Ct. at 2949. Therefore, to escape liability, absent proof of pretext, the defendants need only "articulate some legitimate nondiscriminatory reason for the employee's rejection." *Waters*, 438 U.S. at 578, 98 S.Ct. at 2950, *quoting, McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824.

## I. *Discriminatory Termination*

 Graham's first cause of action in the complaint asserts a claim for violation of Title VII by discriminatory termination of employment on the basis of sex. To establish a *prima facie* case where a reduction in the employer's work force is involved, a plaintiff must prove by a preponderance of the evidence: (a) that she belonged to a class of persons protected by Title VII; (b) that she suffered an unfavorable employment action at the hands of her employer; (c) that she was qualified to assume another position at the time of her discharge; and (d) that the employer did not treat gender neutrally, but discriminated based upon it. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824[9]; *Williams v. General Motors Corp.*, 656 F.2d 120, 128–29 (5th Cir.1981) (age discrimination case rebutted by employer's reduction in force), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *Gilyard v. S.C. Dept. of Youth Services*, 667 F.Supp. 266, 269 (D.S.C.1985) (race discrimination charged by school principal rebutted by proof of work reduction resulting from merger of schools). To rebut a *prima facie* case the defendants need only "pro-duce enough admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1095. *See also Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 & n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978).

The first two elements of the *prima facie* case cannot reasonably be disputed. *See* 42 U.S.C. § 2000e–2. With regard to Graham's qualifications for another position at Texasgulf, the Court is not persuaded that Graham has met her burden. The evidence shows that at the time the decision was made to discharge Graham, there were, at most, three possible alternative positions. The first alternative was to transfer Graham to the situs of one of her client's as Strait had done. At that time, however, Graham's only significant client at a distant situs was in Colorado, the base of the Special Projects Unit. A transfer to Colorado was foreclosed by the fact that Graham's work with the Unit was winding down and the Unit itself was being reduced. The second possible alternative was the job offered her in the Tax Department. Because that position required more clerical than legal skills, Graham was, in fact, overqualified. The defendants' rejection of Graham's demand that the position be changed to "Special Counsel to Chief Financial Officer" with a higher pay scale was reasonable, especially in light of the type of job that was contemplated by the defendants. *Cf. Mason v. Continental Ill. Nat. Bank*, 704 F.2d 361, 366 (7th Cir. 1983). The third alternative was for Graham, rather than McGuire, to remain in the employ of the Law Department. Even assuming Graham's qualifications were equivalent to, or better than McGuire's, the

---

**9.** In *McDonnell* the plaintiff was laid off in the course of a general reduction of force. Defendant's refusal to rehire plaintiff after the lay off precipitated a suit based on race discrimination. The Court indicated that the requirements for a *prima facie* case are not etched in stone. "The facts necessarily will vary . . ., and the specification [of these elements] of the *prima facie* proof required . . . [are] not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. The Court has adapted the *McDonnell* requirements to the facts of this case. *See, e.g., Furnco Constr. Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

Court is persuaded that the defendant's reasons for retaining McGuire were founded in legitimate, nondiscriminatory business judgment. *Cf. Waters*, 438 U.S. at 578, 98 S.Ct. at 2950 (Courts are less competent than employers to restructure business practices, and unless mandated by Congress, should not attempt to do so).

▮ It also appears to be part of Graham's theory that because the decision to discharge Graham was reached exclusively by members of the opposite sex, and was based on highly subjective factors without regard to Graham's high performance ratings, the defendants did not treat gender neutrally. *See Hopkins v. Price Waterhouse*, 618 F.Supp., 1109, 1119 (D.D.C. 1985). The evidence shows that McGuire was retained because, *inter alia*, McGuire's aircraft work was active while Graham's tax and Special Project work was dwindling; and McGuire and the others could more easily assume her other duties rather than she assume his. There is no evidence that McGuire was retained for reasons having to do with gender. As a matter of law this remains true even if McGuire was not more qualified than Graham, so long as he was not less qualified. *Mason*, 704 F.2d at 366; *Knight v. Nassau Cty. Civil Service Comm'n.*, 649 F.2d 157, 161 (2d Cir.1981) (Title VII does not require that a candidate for a job be the most qualified, only that the decision among candidates not be discriminatory). Nor is it dispositive of discriminatory animus if defendants' perception of Graham's qualifications were based in part on subjective evaluation. *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980) (Friendly, J.) ("When a

decision to hire, [or] promote ... one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be shown"); *see also EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 726 (4th Cir.1980) (an element of subjectivity is essentially inevitable in all employment decisions). There being no showing of discriminatory animus in the decision that McGuire was in a better position to conduct the remaining affairs of the Law Department, nor that McGuire was less qualified than Graham, the Court is convinced defendants' choice to discharge Graham was well within the proper exercise of their discretion. *Burdine*, 450 U.S. at 259, 101 S.Ct. at 1096; *see also Lieberman v. Gant*, 630 F.2d at 67; *Schutz v. Western Pub. Co.*, 609 F.Supp. 888 (N.D.Ill. 1985) (female plaintiff failed to prove a *prima facie* case for discriminatory discharge claiming that she was relatively better qualified for position than the male employees that were retained after employer reorganized its sales force) [10].

Assuming *arguendo* that Graham established a *prima facie* case of discriminatory termination, the Court hereby finds that there was sufficient rebuttal of that evidence with no persuasive evidence of pretext. Accordingly, the first cause of action is DISMISSED.

II. *Retaliatory Discharge From Employment*

▮ Graham's second cause of action asserts a claim for violation of Title VII for retaliatory discharge from employment for Graham's opposition to allegedly discrimi-

---

**10.** Plaintiff urges the Court to infer discriminatory animus from the fact that the personnel decision that affected Graham—the only female in the Law Department—was made only by males, and was based on highly subjective factors that contradicted objective evaluations. Graham also cites *Allen v. Lovejoy*, 553 F.2d 522 (6th Cir.1977), arguing that the facts that the defendants affirmatively sought to hire a female, and that the defendants held a stereotypical view of females (demonstrated by their requiring Graham to wear skirts and to use her husband's surname) buttressed this argument (Plaintiff's Proposed Findings at ¶ 12). This argument is not availing. First, if the Court was

to make such an inference it would not necessarily give rise to a *prima facie* case. *See Burdine*, 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7, & *supra*, note 8. Second, the acts upon which Graham urges the Court to make the inference, occurred nearly seven years before the acts complained of. These acts "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).

natory acts. To succeed on this claim Graham has the burden of proving: (a) protected participation or opposition under Title VII known by the alleged retaliator; (b) an employment action or actions disadvantaging persons engaged in protected activities; and (c) a causal connection between the first two elements (*i.e.*, but for her activity, she would not have been discharged when she was). *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980). As is true with the first cause of action under Title VII, the order of proof set forth in *McDonnell Douglas Corp.*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25, applies.

■ It is undisputed that Graham did not file a formal complaint with the EEOC until December 5, 1983, close to three months after her discharge. However, the protection afforded by Title VII against retaliation, 42 U.S.C. § 2000e–3(a), is not limited to individuals who have filed formal complaints, but may also extend to informal protests. *Sias v. City Demonstration Agency*, 588 F.2d 692, 694–96 (9th Cir. 1978); *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981); *EEOC v. Kallir, Philips, Ross, Inc.*, 401 F.Supp. 66, 71–73 (S.D.N.Y.1975) (Weinfeld, J.). Furthermore, the statute shields an employee from retaliation regardless of the merit of her discrimination charge so long as she can show a "good faith, reasonable belief that the underlying challenged employment exists and violates Title VII." *Francoeur v. Corroon & Black Co.*, 552 F.Supp. 403, 412 (S.D.N.Y.1982); *see, e.g., Parker v. Baltimore & Ohio R.R*, 652 F.2d 1012, 1020 (D.C.Cir.1981); *Sias*, 588 F.2d at 692. In addition, the way in which an employee expresses her opposition to the employer "must be reasonable, as determined on a case by case basis, by balancing the purpose of Title VII, and the need to protect individuals asserting their rights thereunder, against an employer's legitimate demands for loyalty, cooperativeness and a generally productive work environment." *Francoeur*, 552 F.Supp. at 412. *See, e.g., Hochstadt v. Worcester Found.*, 545 F.2d 222, 231 (1st Cir.1976); *Pendleton v. Rumsfeld*, 628 F.2d 102 (D.C.Cir.1980);

*Kallir, Philips, & Ross, Inc.*, 401 F.Supp. at 71–72, (citing, *McDonnell Douglas Corp.*, 411 U.S. at 803, 93 S.Ct. at 1824). This last standard disposes of Graham's claim without the Court having to make a determination with regard to her good faith or reasonable grounds for engaging in the type of activity that she did.

■ After learning of her prospective discharge scheduled for the end of October, Graham commenced a practice of communicating her disgruntlement to her superiors in the Law Department and Texasgulf management by way of memo, rather than the face to face contact that was customary for that office. Graham severed ties with her colleagues, and refused to comply with the reasonable demands of her employer that she cooperate in monitoring the transition of her affairs at the Law Department. Notwithstanding the claims that Graham had cordoned herself off in her office, the Court finds credible the evidence that Graham's overall conduct detracted from the cooperative spirit and the exchange of ideas characteristic of, and necessary to the continued productivity of the Law Department. Leaving on these terms certainly militated against retaining her for consulting purposes after her departure.

Any evidence of Graham's *prima facie* case for retaliatory dismissal was sufficiently rebutted without any evidence of pretext. *See, e.g., Hochstadt*, 545 F.2d at 233. Accordingly, Graham's second cause of action is DISMISSED.

### III. *Breach of Contract*

Graham's third cause of action asserts a common law claim for breach of contract. Her theory supporting this claim, although not briefed adequately, is two-fold. First, the defendants breached her employment contract by terminating her employment on September 19, rather than on October 31, as defendants had promised at the meeting of July 26. Second, by discharging her before October 31, defendants breached

their promise to retain her for a consulting arrangement [11].

If there was a contract, the negotiations occurred in Connecticut, and it was to be performed in Connecticut. Consequently, Connecticut law controls the analysis of the breach of contract claim. *Grand Sheet Metal Products Co. v. Aetna Cas. & Sur. Co.,* 500 F.Supp. 904, 908 (D.Conn.1980); *Breen v. Aetna Cas. & Sur. Co.,* 153 Conn. 633, 220 A.2d 254 (1966).

██ To succeed, the plaintiff bears the burden of proving the existence of a contract, *Malarney v. Peterson,* 159 Conn. 342, 269 A.2d 274 (1970), her performance or legally excused non-performance of the obligations of the contract, *Ravitch v. Stollman Poultry Farms,* 165 Conn. 135, 328 A.2d 711 (1973), the breach of the contract's obligations by the other party, and damages stemming therefrom. *Calig v. Schrank,* 179 Conn. 283, 426 A.2d 276 (1979).

██ When Graham first was hired by Texasgulf it was for an indefinite term. Generally, a contract for an indefinite term of employment may be terminated by either party at any time with or without cause. *E.g., Somers v. Cooley Chevrolet,* 146 Conn. 627, 629, 153 A.2d 426 (1959); *Boucher v. Godfrey,* 119 Conn. 622, 627, 178 A. 655 (1935) [12]. It cannot reasonably be questioned that the defendants' initial decision to discharge Graham on October 31 was well within their contractual rights.

██ Assuming that a contract of employment for the period of July 26–October 31 did exist, Graham's earlier discharge on September 19 does not entitle her to damages or compensation for salary or wages she might have earned. *Cf. Viall v. Lionel Mfg. Co.,* 90 Conn. 694, 102 A. 709 (1916) (termination by one party of an employment contract entitles the other to damages for breach as well as to wages earned). Graham simply may not avail herself of the nonperformance which she has occasioned. *E.g., Columbus Ry. & Power Co. v. Columbus,* 249 U.S. 399, 39 S.Ct. 349, 63 L.Ed. 699 (1919). It was Graham's failure to follow reasonable instructions, and to conduct herself in a manner that was not adverse to her employer's interests that occasioned her early dismissal. *Heyman v. Kline,* 344 F.Supp. 1088, 1101 (D.Conn. 1970), *rev'd on other grounds,* 456 F.2d 123 (2d Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972); *Cf. N.L.R.B. v. Consolidated Diesel Elec. Co., Div. of Condec Corp.,* 469 F.2d 1016, 1025 (4th Cir.1972) (refusal to obey instructions is lawful grounds for discharge from employment). Under the circumstances of Graham's early discharge, discussed *supra,* sections I–II, Texasgulf was excused from any performance that may have been required under the promises made regarding Graham's severance from Texasgulf.

To the extent defendants' offer for consulting work can be construed as a separate, divisible contract, plaintiff's claim must also fail. Considered separately, the consulting offer was for an indefinite term. Texasgulf was entitled to rescind the offer or terminate the contract at any time with or without cause. *Boucher,* 119 Conn. at 627, 17 A. 665.

---

**11.** Graham also claims that defendants breached their promise to pay her severance benefits upon her discharge. There is no evidence that the defendants' offer for severance benefits was accepted by Graham either explicitly, or impliedly by her signing of the release. Even were there a valid offer and acceptance of the promise for severance benefits, it still is not enforceable against the defendants. The requirement that Graham sign a release before she would be entitled to the severance benefits was a condition precedent of the promise. The nonoccurrence of that condition entitled the defendants to rescind or to treat their contractual obligations with regard to the payment of the benefits as discharged. *See Internatio-Rotterdam, Inc. v. River Brand R.M., Inc.,* 259 F.2d 137, 140

(2d Cir.1958), *cert. denied,* 358 U.S. 946, 79 S.Ct. 352, 3 L.Ed.2d 352 (1959). Obviously, Graham's consideration, her forbearance to sue, is also lacking.

**12.** An exception to the general rule regarding employment contracts terminable at will exists where the "former employee can prove a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." *Sheets v. Teddy's Frosted Foods, Inc.,* 427 A.2d 385, 179 Conn. 471, 475 (1980) (emphasis in original). The cause for Graham's discharge does not fall within this exception. *See supra,* sections I–II.

Accordingly, the third cause of action is DISMISSED.

## IV. *Title VII: Sex Discrimination in Salary*

Graham's fourth cause of action asserts a claim for violation of Title VII by sex discrimination in salary. Like her other Title VII claims, to succeed Graham must prove a *prima facie* case of disproportionate treatment by a preponderance of the evidence. *Horton v. Town of Bennington*, 603 F.Supp. 1254, 1256 (D.Vt.1985), *citing*, *Spaulding v. University of Washington*, 740 F.2d 686 (9th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). Should this burden be met, the burden then shifts to the defendant to "articulate some legitimate nondiscriminatory reason for the pay disparity." *Horton*, 603 F.Supp. at 1256. In surrebuttal, the plaintiff may have the opportunity to show that defendant's explanation is mere pretext. *Id. See also McDonnell Douglas Corp.*, 411 U.S. at 802–03, 93 S.Ct. at 1824–25.

▐ Notwithstanding the fact that plaintiff did not see fit in her post-trial findings to cite any case authority that directly supports her claim, the Court finds it without merit. Although it appears there was some disparity in salary among Graham, the only female, and the males in the Law Department, such disparity alone is insufficient to establish gender based discrimination. *Spaulding*, 740 F.2d at 700.

Discriminatory intent may not be inferred from [the] existence of wage differences between jobs that are only similar, the comparability of duties and job description can be relevant to determine if one can infer discriminatory animus in a disparative wage case, but plaintiff must still prove intent to discriminate.

*Horton*, 603 F.Supp. at 1256, *citing*, *Spaulding*, 740 F.2d at 700–01. The credible evidence shows that Graham's salary did lag behind that of her male colleagues. However, prior to her being hired, Graham's experience also lagged behind that of the others. She had no baccalaureate degree and had not proved her ability in any sort of law practice in the United States prior to her joining Texasgulf. These differences from the others in the Law Department present legitimate, nondiscriminatory reasons for the differences in pay among the attorneys in the Law Department. *Calage v. University of Tenn.*, 400 F.Supp. 32 (D.Tenn.1975), *aff'd*, 544 F.2d 297 (6th Cir.1976).

The evidence shows there were differences in pay among both the one female and the male attorneys. The apparent reasons for these differences are legitimate and nondiscriminatory. The plaintiff has simply failed to meet her burden of proving any discriminatory intent with regard to the disparity of salary. Accordingly, the fourth cause of action is DISMISSED.

## V. *Equal Pay Act Claim*

▐ Graham's fifth cause of action asserts a claim for violation of the Equal Pay Act. 29 U.S.C. § 206(d)(1) ("EPA"). The EPA prohibits an employer from discriminating, in the payment of wages, between employees on the basis of one's gender. To succeed on this claim, Graham must establish a *prima facie* case that Texasgulf paid different wages to employees of opposite sexes "for equal work on jobs, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). The plaintiff has the burden of proving by a preponderance of the evidence that allegedly equivalent jobs involve "equal work." Once the *prima facie* case has been established, the burden shifts to the employer to prove that the pay differential is due to a seniority system, a merit system, a system that measures earnings by quantity or quality of production, or any other factor other than sex. 29 U.S.C. § 206(d)(1); *Corning Glass Works*, 417 U.S. at 196, 94 S.Ct. at 2229. Once again, the plaintiff has failed to direct the Court to any authority that might support her claim (*see* Plaintiff's Proposed Findings and Conclusions ¶¶ 18, 22).

The Court is not convinced that the jobs of the attorneys in the Law Department demand equal skill, effort, and responsibility. *Cf. Horner v. Mary Institute*, 613 F.2d 706 (8th Cir.1980) (teachers within one department of school found not to have equal responsibility under EPA, rather, each required different training and experience). Assuming *arguendo* that the jobs of the attorneys within the Law Department are equal under the EPA, the defendants have shown that pay disparity was based on factors other than sex. *See* § III, *supra.* Accordingly, Graham's claim for violation of the EPA is DISMISSED.

SO ORDERED.