Lekunutu MATIMA, Plaintiff–Appellant,

v.

Andrea E. CELLI, Trustee with reference to the Chapter 13 bankruptcy of Lekunutu and Mabatho Matima, Bankruptcy Case No. 95–14372, Trustee,

Ayerst Laboratories Incorporated, Defendant–Appellee.

Nos. 1500, 606, Dockets 97–9451, 98–7199.

United States Court of Appeals, Second Circuit.

Argued: April 16, 1999

Decided: Sept. 18, 2000

Lekunutu Matima, pro se, Plattsburgh, New York, for Plaintiff–Appellant.

Melvin H. Osterman, Albany, New York (Beth A. Bourassa, Whiteman Osterman & Hanna, on the brief), for Defendant–Appellee.

Before: JACOBS and STRAUB, Circuit Judges, and WEINSTEIN, District Judge.*

JACOBS, Circuit Judge:

Plaintiff-appellant Lekunutu Matima ("Matima") alleged that his former employer, Ayerst Laboratories, Inc. ("Ay-

---

* Jack B. Weinstein, of the United States District Court for the Eastern District of New York, sitting by designation.

erst"), discriminated against him because of his race and national origin and discharged him in retaliation for complaining about that discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, as amended by the Civil Rights Act of 1991 ("Title VII"); 42 U.S.C. § 1981; and New York State Executive Law § 296. After an eight-day trial, during which Matima appeared *pro se,* a jury found (i) that Ayerst's employment actions were not motivated by race or national origin, (ii) that they were motivated by unlawful retaliation, but (iii) that Ayerst would have taken the same employment actions in the absence of the retaliation. The United States District Court for the Northern District of New York (Hillman, *Visiting Judge* ) therefore entered judgment in Ayerst's favor. On appeal, Matima principally argues that the jury had no basis to find that Ayerst's actions were anything but retaliatory, because Ayerst's non-retaliatory reasons for firing Matima were that he protested perceived workplace discrimination in ways that were inappropriate and disruptive. Matima argues therefore that there was insufficient evidence to support the jury's finding that Ayerst would have taken the same employment actions in the absence of the unlawful retaliation.

After hearing oral argument, we suspended consideration of the appeal pending Matima's filing of a complete trial transcript. Many months of delay ensued because no transcript had been prepared during trial, or afterward; Matima's application for a free transcript pursuant to 28 U.S.C. § 753(f) was not granted until August 31, 1999; and the court reporters were unable to complete the transcription until December 1999.

We have now reviewed the full trial transcript and conclude that the evidence presented at trial was sufficient to support the finding that Ayerst terminated Matima's employment for reasons that were both retaliatory and legitimate. We therefore affirm.

**BACKGROUND**

As discussed in more detail below, we construe Matima's principal argument on appeal to be that he was entitled to judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. We therefore view the evidence presented at trial in the light most favorable to Ayerst, the non-moving party, giving it the benefit of all reasonable inferences that the jury may have drawn in its favor. *See Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998); *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998).

We nevertheless lay out Matima's testimony in some detail because the jury verdict may have rested in part on the finding that Matima, though truthful, had an impaired sense of reality and had interpersonal relationships that provoked or contributed to his inappropriate behavior and insubordination.

### A. The Employment Relationship

Ayerst, a pharmaceutical company, hired Matima as an entry-level pharmacist on January 30, 1989. Matima, who has a masters degree in pharmaceutics, was assigned to Ayerst's liquids and parenterals (injections) division at Ayerst's plant at Rouses Point, New York. Throughout his employment, Matima, who is a black South African national, received "satisfactory" ratings on his performance evaluations while his colleagues, almost exclusively white, received the higher "commendable" rating on theirs.

#### 1. Initial Complaints

During his first year at Ayerst, Matima complained that a supervisor was making racially motivated attacks on his integrity and character. The Rouses Point personnel office first learned of the complaints when it received Matima's responsive comments in connection with his 1990 performance evaluation. Gary Wagoner, of the

personnel office, and Dr. Thomas Leonard, the associate director of the liquids and parenterals division, investigated Matima's complaints and found that the six events of discrimination alleged by Matima either did not happen or were not racially motivated.

On June 3, 1991, Matima discussed his allegations with Ralph Boardman, the manager of the Rouses Point plant. At Boardman's request, Matima put his allegations in writing, and wrote Boardman a nine-page, typed letter, dated June 6, 1991, in order to "protect myself from what I consider unfair, mean-spirited and illegal treatment by my department's supervisory personnel and co-workers." Matima specifically complained that: (i) he had been denied recognition for his role in the development of the drug Rapamycin; (ii) he was ordered to work in a lab with inadequate precautions against HIV and hepatitis infection, and was taken off the project when he alerted an Ayerst safety officer about the risk; (iii) he had not been promoted despite taking on the work of a former employee who had worked at the level above Matima; (iv) his performance evaluations were unfair and inaccurate, and no supervisor was willing to discuss them; (v) he was given no training on certain equipment and techniques that were vital to his work in the division, and was not permitted to transfer to another division; and (vi) he was harassed because of his race, in violation of Ayerst's fair treatment policy, and the Rouses Point personnel manager, who asked to see Matima's green card each time Matima went to consult with him, took no remedial action. Matima delivered the letter to Boardman on June 10, 1991. Ayerst considered the letter to be an "assurance of fair treatment complaint" as that term was defined by Ayerst's personnel policies.

On July 1, 1991, Matima received a written response from Dr. Richard Weierstall, Ayerst's assistant vice-president of pharmaceutical sciences. Weierstall's letter (i) reported that Ayerst had investigated Matima's complaints and found that there had been "no attempt to harass" Matima, nor "any discriminatory activities directed against" him; (ii) opined that "a lack of communication and some misunderstandings may have contributed to the deterioration of working relationships between you, your peers and your supervisors"; (iii) specifically addressed each of the issues raised in Matima's June 6 letter to Boardman; and (iv) concluded by "suggest[ing] that in [the] future, should a problem arise, the matter should be brought to the immediate attention of your Supervisors, Dr. Piccolo, Dr. Leonard or Dr. Enever."

On July 9, 1991, Matima met with a group of his supervisors, who expressed a desire to work with Matima on the concerns articulated in his complaint. A week later, Leonard sent a memo to Matima suggesting that they schedule biweekly meetings to review any problems Matima was having in the lab, to improve communication and reduce misunderstanding.

Dissatisfied with these initiatives, Matima answered Weierstall on July 25, 1991, characterizing Weierstall's July 1, 1991 letter "as an attempt to discredit my honest attempt to right a situation that is very unjust," and attacking the investigation: "[t]he investigation itself was conducted in secret. I was never informed about the presence of two men from [corporate headquarters at] Radnor who were in Rouses Point for this investigation. So, I was not afforded the rights accorded by the Fair Treatment Policy of this company." Matima concluded that "only the intervention of unbiased, committed upper level management will resolve these matters satisfactorily," and asked that his complaint be forwarded to senior executives at Ayerst.

Matima also requested a meeting with Dr. Gerald Papariello, a vice president at Ayerst's headquarters in Radnor, who met with Matima when Paperiello came to the Rouses Point plant on August 20, 1991. According to Papariello's memo to the file on that meeting, he explained to Matima

why he was not listed on some of the patent applications for variants of the drug, and told Matima to deal with his concerns about performance evaluation and promotional opportunity at the biweekly meetings with Leonard, but Matima "went off on a tangent talking about threatening telephone calls, threats on his life, and investigations by the police and FBI. He stated that the police were close to naming an individual involved and that it was a Wyeth–Ayerst employee."

In a letter to Leonard on September 7, 1991, Matima denounced the biweekly meetings as "a cynical ploy to divert attention from my very serious complaints I enunciated in my letter to Mr. R. Boardman, dated June 5, 1991[sic]," stressed that " 'lack of communication' has never been the issue with me but racially discriminatory practices by you and others are the problem," declared that only top Ayerst executives, including Ayerst's president, "can finally and decisively resolve these important concerns," and advised that he would "soon request Dr. G. Papariello to forward my complaints to them as is my right under Wyeth–Ayerst's policy of Assurance of Fair Treatment."

The Rouses Point personnel office thereafter arranged for Matima to meet with Dr. Gary Neil, Ayerst's corporate vice president of research, on October 15, 1991, at Ayerst's headquarters in Radnor.

### 2. Confrontations with Supervisors

Before Matima went to Radnor, Leonard approached him in the lab and asked "if he could come into my office as I needed to chat with him. Mr. Matima began yelling at me that he would not come into my office. He was very agitated, and began hurling accusations in regards to my behavior towards him. . . . I turned away and left the laboratory without further comment." Matima recalled the encounter differently: Leonard said, "You, follow me to the front"; Matima hesitated; and Leonard asked, "Or you want me to call

the police to drag you like a dog to the front?"

The next day, Dr. Robin Enever, senior director of pharmaceutics at Rouses Point, went to Matima's lab and asked to speak with him about the episode with Leonard. Matima asked if he could call in a witness and Enever agreed, thinking that Matima would bring someone who had been present the previous day. When Matima brought George Owoo, who had not been an eyewitness, Enever questioned Owoo's presence. At that point, according to Enever, Matima made "an outpouring of accusations, basically that I had denied him his rights and that he was gonna call a press conference." Owoo was able to calm Matima down and escort Matima back to the lab. Subsequently, while Enever was meeting in his office with Leonard and Weierstall, Matima opened Enever's office door without knocking and, according to Enever, "proceeded to berate the three of us . . . again for not supporting his rights, essentially claiming that we were discriminating against him racially, that we hadn't given him due credit for his efforts and so on."

Enever, Leonard and Weierstall immediately met with Frank Jedliskowski, the personnel manager of the Rouses Point plant, to discuss Matima's behavior. After seeking advice from company headquarters, they decided to remove Matima from the plant because "he was too emotional and his behavior was affecting others." At Matima's request, Jedliskowski wrote Matima a memo which stated: "In the best interests of yourself and others, we are excusing you from work with pay for today, October 11, 1991 and Monday, October 14, 1991. This will give you an opportunity to prepare for your October 15, 1991 meeting in Radnor."

At Radnor, on October 15, Matima met with two senior Ayerst executives, Neil and Dr. Edward Adams. Matima testified that he attempted to discuss the complaints he had made in his June 6, 1991

letter, but that the executives indicated that they were not interested.

Matima further testified that after he returned to work, the racial hostility intensified and none of his supervisors or co-workers would speak with him. Matima's annual performance evaluation, dated September 26, 1991, contained many concerns about Matima's relationships with his supervisors and co-workers. Piccolo added an objective for the following year that entailed "controlling temper and improving interpersonal relationships with supervisors and peers."

### 3. *Further Complaints and Suspension*

In November 1991, Matima filed a race discrimination complaint against Ayerst with the New York State Division of Human Rights ("NYSDHR"), which has a work-sharing agreement with the Equal Employment Opportunity Commission ("EEOC").

In December 1991, Matima wrote to Neil, asking for an update regarding Ayerst's investigation of Matima's claims of discrimination following the October meeting in Radnor. Neil and Adams responded by letter dated December 18, 1991, that Ayerst believed Matima's complaint had been "satisfactorily resolved." Matima expressed his disagreement. Neil again wrote to Matima on January 9, 1992, advising that Ayerst's "review of [Matima's] allegations with respect to discrimination indicates no evidence of discrimination on Wyeth Ayerst's part regarding opportunities for recognition or advancement." In January 1992, Piccolo sent Matima a memo asking him to complete the self appraisal form required of all Ayerst employees. Matima responded with another complaint of discrimination:

I find it very disturbing that after three years of producing "observable and quantifiable" work for Wyeth–Ayerst, I am still waiting to be credited with and rewarded for my efforts. I also find it cynical of you, Dr. Piccolo, to *ignore* all the violations of my civil rights (state and federal) for the past three years and then expect me to fill out a "self-appraisal form" hardly two weeks after a most *libelous* appraisal (1991–1992) you made of me. Your evaluations from 1989–1991 are *illegal* under New York State law. Two questions, "(1) When are you going to reward my work (listed below)?, (2) What has suddenly made you, Leonard and others care for my well-being after three years of racially motivated hostility? [A]nd why should I trust you all?"

Enever issued a "Personal Conduct, Formal Written Warning" advising Matima that the tone of his response to Piccolo, and the manner in which it was delivered, "was unacceptable and demonstrates an unwillingness to cooperate with [the self-appraisal] program," and that Matima must end his contacts with senior management outside Rouses Point:

There are proper procedures for having *new* issues addressed by upper levels of management and you must utilize these procedures. Failure to correct your personal conduct in the immediate future will subject you to further disciplinary action up to and including termination of your employment.

On March 11, 1992, Matima wrote to Boardman complaining about racial harassment. The letter, which was also signed by a black colleague, Carol Watson–Cooley, stated in part that "[w]e cannot wait another 500 years and watch everyone ignore our complaints.... Until some effort is made to address these issues, we will remind you that it is *your duty* to effect some changes. *The time must be now.*" The letter was copied to Jedliskowski and Ayerst's president in Radnor.

On May 14, 1992, the EEOC issued Matima a right to sue letter. That same day, Matima and Watson–Cooley sent a memorandum to Wagoner and Weierstall charging them with defamation: "It has come to our attention that you gentlemen are en-

gaged in attempts to slander and defame our character.... Please stop playing race politics. Do not set African brothers against each other because you are not going to divide and conquer us anymore." The memorandum was copied to Ayerst's president.

Enever suspended Matima on May 19, 1992, warning him in writing:

"Because you have failed to correct your personal conduct and your failure to obey my instructions, I have no choice but to discipline you again by suspending you from work for a period of 1 work day without pay. I will not tolerate your insubordination and should you continue to disobey my instructions, you will subject yourself to further disciplinary action up to and including termination of your employment."

Enever asked Matima to confirm receipt of the warning by signing it, but Matima refused to sign it, or even read it. Enever then told Matima not to come into work the next day, May 20. Matima testified that he had no idea he had been suspended because he had not read the letter.

### 4. Time Sheet Dispute

Matima was absent from work on May 20, May 21 and May 22, 1992. When Matima returned to work on May 26, he met with Leonard and Piccolo, who asked for documentation to justify Matima's absences. Matima stated that he would fill out a revised weekly time sheet for the week of May 18, detailing his absences. Piccolo and Leonard described the meeting in a memorandum to Wagoner: "Matima was in a moderately agitated state. He talked very rapidly, and somewhat incoherently about illegal actions that had been made by the company against him. He stated that he wanted the company to fire him and get it over with."

Matima promptly filled out time sheets indicating that his absences on May 21 and 22 were personal absences due to "illegal retaliation." At trial, Matima explained that the comment meant that he was ab-

sent because he "was experiencing retaliation on the job," including harassment in the lab, after filing complaints of racial discrimination. Piccolo approved the time sheet.

That same day, May 26, 1992, Matima wrote to Enever re: "(1) Violation of my First Amendment / Freedom of Speech Rights; (2) Violation of my Title VII of the Civil Rights Act of 1964 rights regarding *retaliation* for filing Title VII and EEOC complaints; (3) Violation of the Wyeth–Ayerst's Assurance of Fair Treatment policy." According to Matima's letter, "it is unreasonable of you to suggest that matters—about which I have received *no* response or a constructive attempt at resolution or even information as to exactly what facts have been verified or disproved, have been *closed*." Matima took the opportunity to advise that he had filed a second complaint with NYSDHR alleging retaliation and racial harassment.

### B. Termination

On May 27, 1992, Leonard came to Matima's lab with a draft time sheet in hand. The time sheet contained Matima's name at the top and was similar to the one filled out by Matima, but instead of indicating that Matima's personal absences were due to "illegal retaliation," the time sheet indicated that one of the absences, correlating to the day Matima was suspended, was due to "Disciplinary Action." The other absences were described as "Unapproved Absences." Leonard asked Matima to rewrite his time sheet in this manner. Matima refused.

On June 12, 1992, Leonard and Piccolo came to Matima's lab several times asking him to rewrite the time sheet for May 21 and 22 to justify his absences. Matima repeatedly refused, saying that Piccolo had already approved his original time sheet. A group of people, including Jedliskowski, Weierstall and Tom Engel (Ayerst's security chief), convened in the lab, told Matima's colleagues to leave (all did except for

Watson–Cooley), and asked Matima to leave work until he was notified otherwise. Jedliskowski testified that Matima became agitated, started shouting, and kept asking Jedliskowski to fire him. Engel then took Matima by the hand and walked him to the main entrance of the building.

On June 17, 1992, Matima received a letter from Jedliskowski, advising that Matima's status was under review:

This is to inform you that the company is continuing its review of your personal conduct of June 12, 1992. As soon as management has reached a decision relative to employment status, I will contact you. However, during this period of review, you are to remain on suspension without pay pending the results of our management review.

On June 25, 1992, Ayerst fired Matima by certified letter:

Since we were unable to meet in a timely manner, this letter serves to notify you that effective June 25, 1992, your employment at Wyeth Ayerst Laboratories is terminated. This termination results from your continued violation of the Company Rules.

Jedliskowski testified that Ayerst's decision to terminate Matima was based on Matima's "gross insubordination, failure to follow instructions, being insubordinate to his immediate supervisor, and to Dr. Leonard. It was getting to a point where his behavior was so uncontrollable that we weren't getting any work out of Mr. Matima, he was disrupting the labs and we weren't getting any work out of the people...." Piccolo testified similarly that Matima was fired because his "attitude had a negative impact on everyone in the lab." According to Weierstall, "it had gotten to the point where the company was being frozen, in terms of trying to get the work that we had to do done. When it takes three or four people, several hours, to simply discuss with someone why they have to meet company policy, there is no work getting done...." Leonard testified that Matima "was fired for insubordination and basically creating such havoc and discontent in the lab that it was not a suitable work environment for the remaining people on the staff."

## C.  Court Proceedings

The complaint in this action was filed on August 18, 1992. At that time, Matima was represented by counsel.

During discovery in this action, Ayerst learned that Matima had taken documents containing trade secrets from the plant, in violation of various Ayerst policies. Ayerst moved for partial summary judgment on the ground (among others) that Matima was not entitled to some or all of the relief he sought because he "committed misconduct for which he would have been discharged during or prior to June, 1992" if Ayerst had known of it. Affidavits and exhibits submitted in support of the motion established that Matima produced approximately 1,700 pages of documents containing Ayerst trade secrets during discovery. Matima admitted that he began taking the documents in April 1992, after receiving unsatisfactory responses to his complaints of discrimination.

While the summary judgment motion was pending, Matima wrote Magistrate Judge David Hurd to complain that his lawyers were violating his rights by withholding information from him, disregarding his opinion, dragging out discovery and negotiating settlement terms without his knowledge. Magistrate Judge Hurd allowed Matima's counsel to withdraw, and Matima continued with his case *pro se.*

On the summary judgment motion, the district court ruled that the evidence of Matima's misconduct did not preclude continuation of his lawsuit, but limited Matima's claim in two ways: "in the event plaintiff is successful in this action, he will not be entitled to reinstatement nor an award of front pay as part of his damages"; and, pursuant to *McKennon v. Nashville Banner Publishing,* 513 U.S. 352, 353–362, 115 S.Ct. 879, 130 L.Ed.2d

852 (1995), any award of back pay would be limited to the time period between Matima's date of discharge, June 25, 1992 and the date Ayerst discovered Matima's wrongful conduct, April 9, 1993.

This action was then stayed, pursuant to 11 U.S.C. § 362(a)(1), when Matima and his wife filed a Chapter 7 bankruptcy petition. Ayerst apparently negotiated a settlement with the bankruptcy trustee, but before any approval, Matima converted his Chapter 7 filing to a filing under Chapter 13, and the Chapter 13 trustee, Andrea Celli, informed the district court that Matima could retain possession and control over this suit.

Visiting Judge Douglas Hillman presided over a jury trial from October 20 through October 29, 1997. After the parties presented their evidence and closing arguments, Judge Hillman charged the jury in relevant part:

> In order for the plaintiff to recover on his claim of retaliation against the defendant, he must prove, again by the preponderance of the evidence, that the defendant intentionally, unlawfully retaliated against him; that is, plaintiff's complaints of discrimination must be proven to have been a motivating factor in the employment actions of which he now complains, including the defendant's decision to discharge him.

> Now, the mere fact that plaintiff made complaints of discrimination against the defendant and/or was denied certain employment benefits is not sufficient in and of itself to establish his claims under the law. In showing that retaliation was a motivating factor in the decision to deny employment benefits which he has sought, plaintiff is not required to prove that his complaints of racial discrimination were the sole motivation or even the primary motivation for the decision. Plaintiff need only prove that his complaints of racial discrimination played a part in the defendant's decisions, even though other facts may also have moti-

vated the defendants to make the decision.

> If you find from the evidence that plaintiff's complaints of racial discrimination were more likely than not a motivating factor in the defendant's employment actions of which plaintiff complains, including his discharge, you should so indicate on the verdict form.

> Likewise, of course, if you find from the evidence that plaintiff's complaints of racial discrimination were not a motivating factor in the defendant's employment actions of which plaintiff complaints, including his discharge, you should so indicate that on the verdict form.

> Again, defendant claims that even if plaintiff's complaints of racial discrimination were a motivating factor in defendant's decisions, defendant would have taken the same action concerning the plaintiff in the absence of the unlawful motive. Again, on that claim, the burden is on the defendant. If you find that defendant has proved that it would have more likely than not made the same employment decision concerning the plaintiff, even if the unlawful motive was not present, you should so indicate that on the verdict form.

After the charge was delivered, Judge Hillman asked Matima if there was anything about the instructions that he would like to state on the record. Matima said no.

The jury was given a verdict form with the following questions, and after deliberation, made the following findings:

> 1. Has plaintiff Lekunutu Matima proved that his race or national origin was, more likely than not, a motivating factor in the actions of defendant Wyeth Ayerst Laboratories, including defendant's decision to terminate his employment:

> *Answer*: _____ YES __X__ NO

> If your answer to Question No. 1 is "YES," go on to Question 2. If your

answer to Question No. 1 is "NO," go on to Question 3.

2. Has defendant Wyeth Ayerst Laboratories proven that, more likely than not, it would have taken the same employment actions concerning plaintiff, including termination, even if the unlawful motive, namely plaintiff's race or national origin, was not present?

*Answer*: _____ YES _____ NO

Go on to Question 3.

3. Has plaintiff Lekunutu Matima proved that retaliation for making a complaint of race discrimination was, more likely than not, a motivating factor in the actions of defendant Wyeth Ayerst Laboratories, including defendant's decision to terminate his employment?

*Answer*: _X_ YES _____ NO

If your answer to Question No. 3 is "YES," go on to Question No. 4. If your answer to Question No. 3 is "NO," the Foreperson should sign the form of verdict and you should not answer any more questions.

4. Has defendant Wyeth Ayerst Laboratories proven that, more likely than not, it would have taken the same employment actions concerning plaintiff, including termination, even if the unlawful motive, namely retaliation, was not present?

*Answer*: _X_ YES _____ NO

If your answer to Question No. 4 is "NO," go on to Question No. 5. If your answer to Question No. 4 is "YES," the Foreperson should sign the form of verdict and you should not answer any more questions.

## DISCUSSION

■ Matima's position on appeal is (or must be) that (as the jury found) he was fired (i) in retaliation for filing administrative challenges to discrimination, a motive that supports liability, and (ii) in retaliation for making internal protests about discrimination, a motive that also supports liability, or should; and that these motives are unmixed in the sense that they are wholly illegal.

■ We construe this argument as a challenge, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, to the sufficiency of the evidence supporting the jury's finding that Ayerst would have taken the same employment actions even in the absence of unlawful retaliation. *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1187 (2d Cir.1992). We consider this argument even though Matima made no Rule 50 motion in the district court, because Ayerst has failed to argue that Matima waived this argument, and therefore "has not properly preserved [its] right to object to [Matima's] attempt to claim insufficiency of the evidence." *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). Accordingly, we will view the evidence in the light most favorable to Ayerst to determine if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Stratton v. Department for the Aging*, 132 F.3d 869, 878 (2d Cir.1997) (internal citations and quotations omitted). In so doing, we conclude that there was sufficient evidence supporting the jury's verdict.

■ An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived. *See* 42 U.S.C. § 2000e–3(a); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996) (quoting *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988)); *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990). The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, "including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of

co-workers who have filed formal charges." *Sumner,* 899 F.2d at 209 (citing, *inter alia, Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir.1989)). But not all forms of protest are protected by Title VII's prohibition on retaliation. For instance, Title VII "does not constitute a license for employees to engage in physical violence in order to protest discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000).

Matima filed a formal charge of discrimination with the NYSDHR *and* engaged in numerous forms of protest in the workplace. Matima's formal charge of discrimination constituted protected activity under Title VII, and Ayerst does not challenge the jury's finding that Ayerst retaliated against Matima for that conduct.

Ayerst successfully argued to the jury, however, (i) that some of Matima's informal protests disregarded Ayerst's procedures for lodging discrimination complaints, led to unseemly confrontations between Matima and his supervisors, and caused workplace disruption, and (ii) that therefore this conduct furnished a legitimate reason for firing Matima.

▆▆▆▆▆ We have held generally that insubordination and conduct that disrupts the workplace are "legitimate reasons for firing an employee." *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 130 (2d Cir.1996) (citing *Graham v. Texasgulf, Inc.,* 662 F.Supp. 1451, 1462 (D.Conn.1987), *aff'd,* 842 F.2d 1287 (2d Cir.1988)). We have not held specifically that the way in which an employee presses complaints of discrimination can be so disruptive or insubordinate that it strips away protections against retaliation. But we see no reason why the general principle would not apply, even when a complaint of discrimination is involved. An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise.

Many of our sister circuits have come to a similar conclusion, holding that disruptive or unreasonable protests against discrimination are not protected activity under Title VII and therefore cannot support a retaliation claim. *See, e.g., Robbins v. Jefferson County Sch. Dist.,* 186 F.3d 1253, 1260 (10th Cir.1999) ("[W]e hold that, as a matter of law, these activities were not reasonable and did not constitute protected opposition."); *Kempcke v. Monsanto Co.,* 132 F.3d 442, 445 (8th Cir.1998) (quoting *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 230 (1st Cir.1976)) (court "must also consider whether [oppositional] conduct was so disruptive, excessive, or 'generally inimical to [the] employer's interests ... as to be beyond the protection' of [the retaliation provision of the ADEA]"); *O'Day v. McDonnell Douglas Helicopter Co.,* 79 F.3d 756, 763 (9th Cir.1996) (quoting *Silver v. KCA, Inc.,* 586 F.2d 138, 140 (9th Cir. 1976)) ("An employee's opposition activity is protected only if it is 'reasonable in view of the employer's interest in maintaining a harmonious and efficient operation.' "); *Pendleton v. Rumsfeld,* 628 F.2d 102, 108 (D.C.Cir.1980) ("A question of retaliation is not raised by a removal for conduct inconsistent with [the employee's] duties, unless its use as a mere pretext is clear."); *Hochstadt,* 545 F.2d at 230 (addressing "whether plaintiff's overall conduct was so generally inimical to her employer's interests, and so 'excessive,' as to be beyond the protection of section 704(a) even though her actions were generally associated with her complaints of illegal employer conduct.").

Some of these circuits locate this principle in the prima facie case, the first step in the burden-shifting under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). For example, *Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253 (4th Cir.1998), held "as a matter of law," that the plaintiff "did not engage in protected oppositional activity and, there-

fore, did not establish a prima facie case of retaliatory discharge." *Id.* at 260; *see also O'Day*, 79 F.3d at 764 ("[Plaintiff] was not engaged in protected activity under the ADEA, and could legally be discharged for his misconduct.").

■ But we need not decide whether such disruptive, unreasonable conduct raises an issue that bears on the prima facie case, first, because Matima also filed a formal complaint of discrimination (which unquestionably constitutes protected activity), and because, in this mixed motive case, the disruptive and inappropriate workplace behavior has obvious bearing on the second step of the *McDonnell Douglas* burden-shifting analysis, which requires that an employer articulate a legitimate, non-discriminatory ground for an adverse employment action. *See Holt*, 95 F.3d at 130. Once the employer proffers the employee's disruptive behavior as a legitimate, non-discriminatory ground, the decisive principle here can be framed in terms of whether the employee has demonstrated that the stated reason is a pretext for illegal retaliation. *See, e.g., Robbins*, 186 F.3d at 1260 (plaintiff had "not presented a sufficient basis for a jury to find [that the employer's] stated reason [for the employment action was] unworthy of belief"); *Rosser v. Laborers' Int'l Union of N. Am.*, 616 F.2d 221, 224 (5th Cir.1980) (holding "that although [plaintiff] made out a prima facie case of discrimination, the [defendant] had a valid defense since the chosen form of her opposition, a political challenge, is not protected under Title VII"); *Graham*, 662 F.Supp. at 1462 (finding that "*prima facie* case for retaliatory dismissal was sufficiently rebutted without any evidence of pretext" where employee's "overall conduct detracted from the cooperative spirit and the exchange of ideas characteristic of, and necessary to the continued productivity of the [workplace]").

The complicating feature of Matima's case is that the record shows multiple forms of protest—the NYSDHR complaint and informal, disruptive protests—and Ay-

erst requested a mixed motive instruction. Ayerst was entitled to ask the jury to reach this "mixed motive" or "dual motivation" affirmative defense because the evidence presented at trial included "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory [in this case retaliatory] attitude." *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992); *see also id.* at 185 ("We reject the district court's view that a claim of retaliation necessarily presents only a pretext case and cannot be a mixed-motives case."); *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 122 (2d Cir.1997) ("Usually, it is the *defendant* who wants the jury instructed on an affirmative 'dual motivation' defense."). Moreover, the district court's charge and verdict form conformed to those normally provided ·in mixed motive cases. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Ostrowski*, 968 F.2d at 182–83.

The fact that Ayerst elected or was compelled to proceed along lines of mixed motive does not change the analysis, however; Ayerst has simply shouldered the greater burden of proving—rather than simply articulating—that it fired Matima for legitimate reasons.

In pretext cases and mixed motive cases alike, the facts of an employee's behavior, and whether that behavior was disruptive or otherwise inappropriate in character, will often be disputed. Such inquiries are complicated by the phenomenon that disruptive behavior sometimes can be found to be "less attributable to the actions of [the employee] than to the reactions of those around him." *Grant*, 880 F.2d at 1570.

Here, however, a wealth of testimony and incident was available to support the finding that Matima's behavior disrupted his own work and the duties of co-workers, supervisors and managers. And, the

evidence does not compel the finding that Matima's behavior was provoked by Ayerst's inadequate responses to his complaints, even if that matters. Ayerst provided Matima with ample avenues for internal complaint. When Matima was dissatisfied with the results of those complaints, he was not content to pursue administrative and legal remedies; instead, he repeatedly confronted and antagonized his supervisors in inappropriate contexts in a way that was designed to force the company's hand or make it pay a price in reduced productivity, focus and morale.

We therefore conclude that there was sufficient evidence supporting the jury's finding that Ayerst would have fired Matima even in the absence of Ayerst's unlawful retaliation.

■ By operation of 42 U.S.C. § 2000e–5(g)(2)(B), the affirmance of dismissal on a mixed motive finding would not ordinarily prevent the plaintiff from collecting attorney's fees and costs or from receiving certain declaratory and injunctive relief. (Matima had counsel at the outset of this litigation, and presumably incurred costs throughout.) However, all of our sisters circuits to have considered the issue have concluded that 42 U.S.C. § 2000e–5(g)(2)(B) does not apply to mixed motive retaliation findings, and that a mixed motive finding acts as a complete bar to a retaliation claim, precluding any and all relief. *See Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. 1775. *See Norbeck v. Basin Elec. Power Coop.,* 215 F.3d 848, 852 (8th Cir.2000); *Lewis v. Young Men's Christian Ass'n,* 208 F.3d 1303, 1305–06 (11th Cir.2000); *Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 552 n. 7 (4th Cir.1999); *McNutt v. Board of Trustees,* 141 F.3d 706, 707–09 (7th Cir.1998); *Woodson v. Scott Paper Co.,* 109 F.3d 913, 932–35 (3d Cir.1997); *Tanca v. Nordberg,* 98 F.3d 680, 682–85 (1st Cir.1996). We agree. The district court therefore properly entered judgment in Ayerst's favor.

\* \* \* \* \* \*

Matima raises a dozen other issues on appeal. All of them are meritless. We add brief specifics as to a few.

■ Matima moved unsuccessfully for Magistrate Judge Hurd's recusal on the ground that certain of his rulings (on discovery extensions, withdrawal of counsel, and the handling of files under seal) were racially motivated. Matima appeals Judge Hurd's denial of the motion and Judge MacAvoy's denial of a motion to compel the recusal. Recusal is required only if events "indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible,'" *United States v. Conte,* 99 F.3d 60, 65 (2d Cir.1996) (quoting *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). There is no evidence of any bias, racial or otherwise, on the part of Magistrate Judge Hurd or Chief Judge McAvoy.

■ Matima argues that the jury verdict was inconsistent because the jury found retaliation but no racial discrimination. However, juries can rationally find retaliation in situations where discrimination was not present but merely perceived, and there was sufficient evidence to support such a finding here. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998); *Reed,* 95 F.3d at 1178; *Sumner,* 899 F.2d at 209.

■ Matima challenges the district court's denial of his motion to add 22 new "respondents" to his suit. Generally, leave to amend should be "freely given," Fed. R.Civ.P. 15(a), and a *pro se* litigant in particular "should be afforded every reasonable opportunity to demonstrate that he has a valid claim." *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir.1984). We affirm, however, because Matima's "motion [was] made after an inordinate delay, no satisfactory explanation [was] offered for the delay, and the amendment would prejudice the defendant." *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990); *see also Dluhos v. Floating*

*and Abandoned Vessel, Known as New York,* 162 F.3d 63, 69 (2d Cir.1998).

■ Matima's argument that the all-white jury pool violated his right to a trial by a jury of his peers is meritless because Matima failed to demonstrate that the Northern District's jury selection system results in the unfair under-representation or systematic exclusion of blacks, *see United States v. Rioux,* 97 F.3d 648, 654–59 (2d Cir.1996), and this Court has previously upheld the Northern District's system, *see Schanbarger v. Macy,* 77 F.3d 1424 (2d Cir.1996). Matima's related arguments are similarly meritless.

Finally, the district court properly awarded Ayerst costs in the amount of $4,520.05, pursuant to Local Rule 54.1(a) and 28 U.S.C. § 1920.

## CONCLUSION

The judgments of the district court are affirmed.