**Richard TULLO and John Hyland, Plaintiffs,**

v.

**CITY OF MOUNT VERNON, Willie DuBose, and Yuhanna Edwards, Defendants.**

**Nos. 01 Civ. 1248 DC, 01 Civ. 1738 DC.**

United States District Court, S.D. New York.

Dec. 19, 2002.

---

1. The employees have all submitted affidavits indicating their consent to jurisdiction here.

Michael Colihan, Brooklyn, NY, for Plaintiffs.

Law Offices of Rains & Pogrebin, By Ernest R. Stolzer, Julie A. Torrey, Mineola, NY, for Defendants.

**1.** Plaintiffs failed to file a statement of material facts in opposition to the summary judgment motion, as required by local rule 56.1(b). U.S. Dist. Ct., S.D.N.Y., R. 56.1(b). Consequently, the facts asserted in defendants' 56.1 Statement are deemed admitted to

### OPINION

CHIN, District Judge.

In this discrimination case, plaintiffs Richard Tullo and John Hyland allege that defendants the City of Mount Vernon, Willie DuBose, and Yuhanna Edwards unlawfully suspended them and terminated their appointments with the Mount Vernon Auxiliary Police Department (the "Department") because of their race and without due process. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Defendants present compelling evidence that Tullo and Hyland, who are Caucasian, were suspended not because of their race but because they impeded an investigation into allegations that they racially harassed and physically threatened an African-American officer. Defendants also present evidence that Tullo and Hyland were dismissed in accordance with Department procedures, and that the procedures are consistent with due process.

Although plaintiffs deny the allegations, they have not presented sufficient evidence to raise an issue for trial as to whether race was a factor in the defendants' decisions to suspend them and terminate their appointments. Moreover, plaintiffs do not address the merits of their due process claim in their opposition to the motion. Accordingly, and for the reasons set forth below, defendants' motion is granted.

### BACKGROUND

#### A. The Facts

Construed in the light most favorable to plaintiffs, the facts are as follows: [1]

the extent that they are supported by evidence admissible under R. 56(e). U.S. Dist. Ct., S.D.N.Y., R. 56.1(c), 56(d); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 72 (2d Cir.2001). In any event, the facts are largely undisputed.

### 1. *Plaintiffs' Appointment to the Department*

The Mount Vernon Auxiliary Police is a voluntary force that assists the Mount Vernon Police Department by performing crowd control at parades, controlling traffic, and maintaining a police presence at various public events. (Edwards Dep. at 14). Auxiliary police do not receive a salary, nor are they entitled to sick leave, personal or vacation leave, or health insurance, except that they are covered by Worker's Compensation under New York state law. (Tullo Dep. at 13).

Tullo and Hyland became Chief and Deputy Chief of the Department in 1993 and 1994, respectively. (*Id.* at 12). Major Burrell, an African–American male, served as Deputy Chief of the Department from 1998 to 1999. (*Id.* at 52). Hyland and Burrell reported to Tullo, and Tullo was supervised by the Commissioner and Deputy Commissioner of the Department. (*Id.* at 48–49).

The Commissioner of the Department when plaintiffs were appointed was Raynor DeRizzio, a Caucasian male. (*Id.* at 52). Willie DuBose, an African–American male, became the Commissioner in or around late May 2000. Yuhanna Edwards, an African–American male, held the position of Deputy Commissioner of the Department at all times relevant to this action. (*Id.*). At the time of their dismissal, plaintiffs were supervised by DuBose and Deputy Commissioners Edwards, Logan, and Worrell, all of whom were African–American. (*Id.* at 47).

### 2. *The Comment About Hiring Hyland*

Hyland interviewed for the position of Deputy Chief in 1994, with Tullo, DeRizzio, and then-Captain Lombardi, another Caucasian officer. (Tullo Dep. at 51). Although he did not interview Hyland, Edwards stated that he did not want to hire him because it would "[make] the rank structure too white." (*Id.*). Hyland was hired anyway.

### 3. *Plaintiffs' Work Performance*

Tullo and Hyland had no disciplinary history prior to their suspension. In addition to supervising his work for the Department, Edwards supervised Tullo's research for a Master's Degree in Human Services Administration from Audrey Cohen College, which Tullo received in 1996. (*Id.* at 10). As his master's project, Tullo developed rules and regulations governing the Department with Edwards's feedback. (*Id.*). Edwards was "very" helpful in this regard and gave positive reviews regarding Tullo to Audrey Cohen College. (*Id.*).

### 4. *Denial of Promotion to Commissioner*

Before DeRizzio left the Department in 2000, Tullo submitted his application for Commissioner to DeRizzio and asked him to pass it on to whomever would appoint a new Commissioner. (*Id.* at 115). Tullo followed up with DeRizzio a few days later. According to Tullo, DeRizzio stated that Tullo "wasn't going to get it. They had a white police commissioner, white police chief, and they didn't want another white boss of the police department." (*Id.*).

### 5. *Suspicions of Hostility*

Hyland testified that after DeRizzio left his post, Edwards and the other African–American officers began treating plaintiffs with hostility. (Hyland Dep. at 68). According to Tullo, Deputy Commissioners Logan and Worrell wrote memos changing the reporting procedures and assigning plaintiffs "sergeant" duties, which Tullo referred to as the "garbage part of the jobs." (Tullo Dep. at 46). Tullo believed this was an effort to motivate plaintiffs to leave because they are Caucasian. (*Id.*).

Although he testified that Burrell ·did not assume his or Hyland's duties while at the Department, Tullo suspected that the Commissioners were grooming Burrell to replace him. (*Id.* at 105). This was because of "snide remarks" from Edwards, Logan, and Worrell and their insistence that plaintiffs bring Burrell "up to speed" quickly. (*Id.*). Hyland also thought that Edwards and DuBose reassigned some of his responsibilities to Burrell. (Hyland Dep. at 75).

### 6. *The June 9, 2000 Complaint*

On June 9, 2000, Commissioner DuBose received a written complaint from Auxiliary Police Corporal David Middleton, who is African–American, alleging that Tullo and Hyland threatened him with physical violence and racially harassed him. Middleton's complaint alleged four incidents:

— On March 10, 2000, Hyland allegedly stated "N——s should'nt [sic] be running the City of Mt. Vernon anyway," and "If they had a White Mayor Mt. Vernon would'nt [sic] have the problems they have." (*See* Edwards Aff. Ex. 1, Letter of June 9, 2000 from Corporal Middleton to Commissioner DuBose) (hyphens in original).

— On May 1, 2000, Hyland allegedly told Middleton that Middleton was "In A Lot of S—t" for not locating a missing radio more quickly than he did. (*Id.*).

— On May 10, 2000, in the course of correcting Middleton's instructions to Corporal Wolpow, Tullo allegedly stated "I'ts Done This Way None Of This N——R S—T." [sic]. (*Id.*).

— On June 8, 2000, when Middleton advised Tullo that DuBose had approved a fourteen-day leave of absence for him, Tullo allegedly responded with verbal abuse, profanity, and threats of bodily harm. In particular, Tullo allegedly stated, "I've Wanted to Punch You In The Mouth for The Past Four Years And I'd Like To Do It Now," and threat-

ened to fire Middleton if he did not appear for his tour. (*Id.*).

Although plaintiffs admit that Tullo threatened to punch and fire Middleton, they deny that they used racially derogatory language. (Tullo Dep. at 110–12). For the purposes of this motion, I accept their denials as true.

### 7. *The Investigation*

Upon receiving Middleton's complaint, Commissioner DuBose assigned Deputy Commissioner Edwards to investigate the allegations. Although Departmental regulations provide for the Deputy Chief to investigate complaints, because the allegations here were made against the Deputy Chief, DuBose assigned Edwards to investigate.

The procedures governing the discipline of Department members are established by Interim Orders 10/96 and 4/96. Interim Order 10/96 provides, in pertinent part:

> Upon receipt of a written complaint, the Deputy Chief shall investigate the allegation. If the allegation is determined to have merit, the Deputy Chief shall schedule a disciplinary interview with the accused and the Commissioner or his designee within two weeks of determining that the allegation warrants further action.

(Edwards Aff. Ex. 3, Interim Order 10/96, Dated March 1, 1996). Interim Order 4/96 provides that the Commissioner may suspend a member of the Department for administrative or disciplinary reasons, and that

> [a]ll members of the Department placed on either an administrative leave or disciplinary suspension must surrender their Department shield and ID card.

(Edwards Aff. Ex. 10, Interim Order 4/96). The regulations do not specify in any more

detail how investigations are to be conducted.

On June 28, 2000, Deputy Commissioner Edwards informed plaintiffs of the allegations and attached a copy of Middleton's complaint. (Edwards Aff. Exs. 4, 5, Letters dated June 28, 2000). The letters advised plaintiffs that

> You are being provided an opportunity to respond to the allegation. Kindly submit your written response and a list of witnesses you may have to me by no later than the close of the business day on Friday, July 7, 2000.

(*Id.*).

On July 1, 2000, Hyland wrote Edwards that "given the late date and the Independence Day holiday, I cannot properly respond to these allegations on such short notice." (Edwards Aff. Ex. 11, Letter from Hyland to Edwards dated July 1, 2000). Instead, Hyland wrote that he "intend[ed] to provide ... a response to the allegations on or before July 28, 2000." (*Id.*). Tullo received Edwards's letter on July 8, 2000. He informed DuBose that he had conferred with Hyland and also intended to respond by July 28, 2000. (Edwards Aff. Ex. 12, Letter from Tullo to DuBose dated July 9, 2000).

### 8. *Plaintiffs' Suspension*

On July 11, 2000, Edwards informed plaintiffs that he considered their failure to respond by July 7 to be a violation of a Departmental directive and that the violation was undermining the progress of the investigation. (Edwards Aff. Exs. 6, 7). Consequently, Edwards stated that he would recommend their immediate suspension. (Edwards Aff. Exs. 6, 7). On July 11, 2000, Commissioner DuBose suspended plaintiffs from the Department for impeding the investigation, and requested that they return all Department property. (Edwards Aff. Exs. 8, 9, Letters dated July 11, 2000 from Edwards to Tullo, Hyland).

### 9. *Plaintiffs' Protest of the Suspension*

In a letter to Commissioner DuBose dated July 27, 2000, Michael Colihan, counsel for Tullo and Hyland, protested their suspension and asserted a general denial of Middleton's allegations. (Edwards Aff. Ex. 13). Colihan argued that the Departmental regulations provide for a disciplinary interview but do not require the accused to respond in writing. (*Id.*). In a letter to Colihan dated July 28, 2000, Acting Corporation Counsel John Fico scheduled an interview for August 1, 2000. The interview was adjourned at Colihan's request several times. (*See* Edwards Aff. Ex. 16, Letter dated September 28, 2000 from Edwards to Colihan). On September 28, 2000, Edwards again requested that plaintiffs surrender their badges and identification cards. (*Id.*). Tullo testified that on July 11 he gave Edwards his identification card but not his shield, because he "personally own[ed] that shield," having partially paid for it to be made. (Tullo Dep. at 34).

The interview was supposed to take place on October 5, 2000, at Mount Vernon City Hall. Tullo and Hyland appeared, but they were accompanied by their lawyer, Colihan. Edwards had been expecting merely to interview Tullo and Hyland about the allegations, but Colihan brought a stenographer and a witness and unilaterally converted the proceeding into a hearing as he conducted an examination of the witness. (Tr. at 3–4, 7–8). Colihan stated that his clients were "categorically denying any of these allegations," requested the opportunity to cross-examine Middleton, and refused to let Hyland and Tullo be interviewed or examined. (Tr. at 3–4, 19–21). Initially, no lawyer was present for

Mount Vernon, but Edwards summoned someone from the Corporation Counsel's office. Colihan examined the witness, Corporal Wolpow, who testified as to only one of the alleged incidents in question. According to Wolpow, Tullo did not use a racial invective but instead told Middleton "[y]ou do stupid shit." (Edwards Aff. Ex. 15, Tr. at 13). Middleton was not present and did not testify.

### 10. *Plaintiffs' Dismissal*

On November 27, 2000, Edwards recommended to the Commissioner that Tullo and Hyland be dismissed on the grounds that they failed to respond by July 7, 2000 as ordered; they failed to comply with repeated orders to surrender their badges and identification cards; their witness at the interview testified about only one of the alleged incidents; they failed to respond to the allegations beyond issuing a general denial; and they offered no explanation for the incidents alleged by Middleton. (Edwards Aff. Ex. 17, Letter of Nov. 27, 2000). By letter dated December 4, 2000, Commissioner DuBose adopted Edwards's recommendation and dismissed Tullo and Hyland. (Edwards Aff. Exs. 18, 19, Letters to Hyland and Tullo).

Plaintiffs maintain that they were replaced by "inexperienced African–American officers." (Tullo Dep. at 102). Edwards testified that Deputy Commissioner Logan replaced Hyland as Deputy Chief temporarily, but he did not know who permanently replaced plaintiffs. (Edwards Dep. at 66).

### B. *Procedural History*

Plaintiffs have exhausted their administrative remedies. Plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission (the "EEOC") on or about July 25, 2000.[2] Although the charges predate the termination of plaintiffs' appointments, the circumstances surrounding the subsequent dismissal are reasonably related to the conduct reviewed by the EEOC and I conclude plaintiffs have exhausted their administrative remedies as to the allegedly discriminatory dismissal as well.[3]

The EEOC found no probable cause and issued right-to-sue letters on or about January 17, 2001. Tullo and Hyland commenced these lawsuits on February 20, 2001, and February 27, 2001, respectively, within ninety days after receipt of the right-to-sue letters.

In their complaints, plaintiffs allege race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1983, and due process violations under § 1983. Although they do not indicate the specific provisions, plaintiffs also purport to rely on state law. On March 12, 2001, defendants filed an answer to Tullo's complaint, and on March 23, 2001, the answer to Hyland's complaint. In both answers, defendants denied the

---

**2.** The complaints allege that the charges were filed on July 25, 1999, but that date is obviously incorrect.

**3.** *See Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir.2002) ("Subsequent conduct is reasonably related to conduct in an EEOC charge if (1) the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; (2) if the plaintiff alleges retaliation for filing the EEOC

charge; or (3) the plaintiff 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.' "). Here, although the plaintiffs were dismissed after they filed an EEOC charge contesting their suspension, the plaintiffs allege that they were dismissed in the same manner and for substantially the same reasons. Defendants have not addressed the date of the EEOC charge nor whether the Court should address plaintiffs' dismissal.

allegations and asserted the affirmative defense of qualified immunity as to the individual defendants. By order of this Court dated April 23, 2001, the two cases were consolidated. After the parties completed discovery, this motion followed.[4]

## DISCUSSION

### A. Legal Standards

#### 1. Summary Judgment

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. See Fed R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To create an issue for trial, there must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor. *See id.*

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely col-

orable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *Nat'l Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

#### 2. Race Discrimination Claims

Defendants move for summary judgment dismissing the race discrimination claims on several grounds: as voluntary auxiliary police officers, plaintiffs were not employees covered by Title VII; the individual defendants are not proper defendants on the Title VII claims and the City of Mount Vernon is not a proper defendant on the § 1983 claims; and plaintiffs have not demonstrated that their dismissal was motivated by racial discrimination under Title VII and § 1983. Because the issue is dispositive with respect to both the Title VII and the § 1983 claims, I address only whether a genuine issue of fact exists as to whether plaintiffs were suspended or dis-

---

4. Defendants' motion for summary judgment is granted with respect to plaintiffs' due process claim, for plaintiffs have failed to oppose that prong of defendants' motion. Although plaintiffs filed a Memorandum of Law addressing the race discrimination claims, they do not discuss their due process claims at all. Plaintiffs' failure to do so is not surprising, for the cases have uniformly held that auxiliary police officers are not entitled to a hearing before dismissal for alleged misconduct. *See Bodenmiller v. Regan*, 109 A.D.2d 770,

486 N.Y.S.2d 283 (2d Dep't), *appeal denied*, 65 N.Y.2d 603, 493 N.Y.S.2d 1025, 482 N.E.2d 926 (1985) (holding that volunteer police officers are not entitled to a hearing when dismissed for misconduct); *accord Curby v. Archon*, 216 F.3d 549, 555 (6th Cir. 2000) (auxiliary police officers may be dismissed at will under state law without hearing or notice); *Ziskend v. O'Leary*, 79 F.Supp.2d 10, 14–15 (D.Mass.2000) (auxiliary police officers not entitled to pre-termination hearing under federal constitutional law).

missed because of their race. For purposes of this motion, I assume plaintiffs are "employees" of the Department protected by Title VII.

Title VII makes it unlawful "for an employer ... to ... discharge any individual ... because of such individual's race." 42 U.S.C. § 2000e–2(a)(1).[5] The "ultimate issue" is "whether the plaintiff has sustained his burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,'" i.e., that there was discriminatory intent. *Stratton v. Dep't for the Aging*, 132 F.3d 869, 878 (2d Cir.1997) (quotation and citations omitted). In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies upon the three-step test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). To establish a *prima facie* case of employment discrimination on the basis of race, a plaintiff must show that he (1) is a member of a protected class; (2) who was performing his duties satisfactorily; (3) and was discharged; (4) under circumstances giving rise to an inference of discrimination. *See Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir.2000); *Carr v. Health Ins. Plan of Greater N.Y., Inc.*, 111 F.Supp.2d 403, 413 (S.D.N.Y.2000). The burden of alleging a *prima facie* case

"is a minimal one." *Graham*, 230 F.3d at 38.

Second, if the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *Cruz*, 202 F.3d at 567; *Minott v. Port Auth. of N.Y.*, 116 F.Supp.2d 513, 519 (S.D.N.Y.2000). "This burden is one of production, not persuasion." *Minott*, 116 F.Supp.2d at 519 (citing *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's*, 509 U.S. at 510–11, 113 S.Ct. 2742 (citation omitted); *see James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120–21; *Connell v. Consol. Edison Co.*, 109 F.Supp.2d 202, 207 (S.D.N.Y.2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James*, 233 F.3d at 153. Instead, the key is whether there is suffi-

---

**5.** The same standards apply to a discrimination claim under § 1983 and state law. *See Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir.1998) (Title VII and § 1983 claims); *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992) (Title VII and state claims); *see also Minton v. Lenox Hill Hosp.*, 160 F.Supp.2d 687, 693 n. 4 (S.D.N.Y.2001). Thus, I analyze the § 1983 and the state claims in conjunction with the Title VII claim.

cient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination on the basis of race. *See id.* at 157; *Connell,* 109 F.Supp.2d at 207–08.

As the Second Circuit observed in *James:* "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia Univ.-College of Physicians,* 999 F.Supp. 506 (S.D.N.Y.1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination).

### B. *Application*

Here, I assume that plaintiffs have made out a prima facie case. Moreover, defendants have articulated legitimate, nondiscriminatory reasons for firing them, contending that plaintiffs were dismissed for defying Departmental orders, interfering with the investigation into allegations against them, and improperly disciplining subordinate officers. Hence, rather than address each of the steps of the different prongs of the *McDonnell Douglas* test, I proceed directly to the ultimate question of whether plaintiffs have presented sufficient evidence from which a reasonable jury could find race discrimination. I do so by evaluating first plaintiffs' evidence, then defendants' evidence, and finally the

record as a whole, keeping in mind the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 314 (2d Cir.1997); *see also Siano v. Haber,* 40 F.Supp.2d 516, 520 (S.D.N.Y.1999), *aff'd mem.,* 201 F.3d 432 (2d Cir.1999); *Lapsley,* 999 F.Supp. at 515.

### 1. *Plaintiffs' Evidence*

Plaintiffs point to the following evidence to support their claims that they were suspended and dismissed because of their race: (a) a discriminatory race-based remark made by Edwards; (b) their replacement by non-white officers; (c) statistics; (d) disparate treatment in the terms and conditions of their service with the Department; and (e) pretext.[6] I review the items in turn.

### a. *Discriminatory Race–Based Remark*

Edwards made a race-based remark in Tullo's presence regarding Hyland's appointment as Deputy Chief. Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates a nexus between the allegedly discriminatory statement and a defendant's adverse employment action against the plaintiff. *See, e.g., Campbell v. Daytop Village, Inc.,* No. 97 Civ. 4362(JSM), 1999 WL 292576, at \*3 (S.D.N.Y. May 7, 1999); *Ruane v. Cont'l Cas. Co.,* No. 96 Civ. 7153(LBS), 1998 WL 292103, at \*8 (S.D.N.Y. June 3, 1998) (citing *Spence v. Md. Cas. Co.,* 995 F.2d 1147, 1155 (2d

---

**6.** It remains unsettled in this Circuit whether a plaintiff who is a member of a majority group must allege special circumstances to assert a discrimination claim, e.g., that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Olenick v. N.Y. Tel.,* 881 F.Supp. 113, 114

(S.D.N.Y.1995) (adopting the requirement for majority plaintiffs; *but see Tappe v. Alliance Capital Mgmt.,* 177 F.Supp.2d 176, 181 (S.D.N.Y.2001) (rejecting the requirement as inconsistent with the leading Supreme Court cases on reverse discrimination). I assume, in plaintiffs' favor, that they need not allege special circumstances.

Cir.1993)); *Orisek v. Am. Inst. of Aeronautics & Astronautics,* 938 F.Supp. 185, 192 (S.D.N.Y.1996).

Here, Edwards's race-based comment, that he did not want to hire Hyland because that would make the "rank structure too white," was made *six years* prior to plaintiffs' suspension. Moreover, Hyland was hired anyway, and thus Edwards's remark had no discriminatory effect. As the comment was neither close in time nor otherwise related to plaintiffs' suspensions, it does not constitute evidence of race discrimination on the part of defendants in this case. *See Ruane,* 1998 WL 292103, at *8 (verbal comments constitute sufficient evidence of discrimination when such comments are, *inter alia,* proximate in time to the adverse employment decision and related to the employment decision at issue).

#### b. *Replacement by Non–White Officers*

Tullo testified that he and Hyland were replaced as Chief and Deputy Chief by inexperienced African–American officers. (Tullo Dep. at 102). Edwards testified that Deputy Commissioner Logan temporarily replaced Hyland as Deputy Chief of the Department. (Edwards Dep. at 66). Although I assume that Tullo and Hyland were both more experienced than their replacements, in the circumstances of this case that fact does not constitute evidence of discrimination. Tullo and Hyland were dismissed not for poor performance but purportedly for their lack of cooperation in the investigation. In fact, Hyland was replaced by a higher ranking officer—the Deputy Commissioner. The fact that Tullo and Hyland were replaced by African–Americans does constitute some evidence of discrimination.

#### c. *Statistics*

Plaintiffs contend that although five out of seventeen Department members were white when they first joined in 1993 and 1994, there are no longer any white members of the Department. Plaintiffs contend that these statistics constitute evidence of race discrimination on the part of the defendant.

The fact that none of the seventeen members of the Department is white, of course, constitutes some evidence to support the claim of discrimination. *See Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Ortiz–Del Valle v. Nat'l Basketball Ass'n,* 42 F.Supp.2d 334, 337 n. 1 (S.D.N.Y. 1999). This statistical evidence, however, is not entitled to much weight, for the following reasons. First, census data shows that African–Americans comprise 59% of the population of Mount Vernon, and only 28% of the residents are white. *See* U.S. Census Bureau, U.S. Dep't of Commerce, Census of Population and Housing for City of Mount Vernon, at http://factfinder.census.gov (last visited Dec. 6, 2002). Second, the small sample size—seventeen—makes it difficult to draw any significant conclusion. Third, the Department consists of unpaid volunteers, and plaintiffs have presented no evidence that significant numbers of whites have applied to volunteer and been rejected. *See Ortiz–Del Valle,* 42 F.Supp.2d at 337 (inference of discrimination based on evidence that no women were working as NBA referees was weakened by the lack of evidence that women applied for the positions and were rejected). Hence, although the statistics provide some support for plaintiffs' claims, by themselves the statistics tell little.

#### d. *Disparate Treatment*

Plaintiffs allege that defendants treated them in a disparate manner because of their race. In support of this contention, plaintiffs assert that: (a) white officers were disciplined more harshly than Afri-

can–Americans; (b) their African–American superiors conspired to replace them with African–American officers; and (c) their African–American superiors departed from regulations in the investigation and subsequent suspension and termination of plaintiffs. Plaintiffs' assertions lack factual support, and are largely based on speculation and unsubstantiated "feelings" of racial animus. For the following reasons, no reasonable jury could conclude that any alleged difference in treatment was based on an unlawful discriminatory intent.

### i. *Discipline*

Plaintiffs present two examples of how the Department purportedly disciplined whites more harshly than African–Americans; neither constitutes evidence of racial discrimination in this case. First, plaintiffs contend that Mike D'Allessandro, a white officer suspended because his cell phone rang during a meeting, was subject to disparate treatment. That D'Allessandro was suspended does not alone constitute evidence of racial animus towards whites. Edwards was not responsible for disciplining D'Allessandro. (Edwards Dep. at 66). Moreover, Hyland testified that he did not know of any other white officers disciplined by the Department, and that there were no other white officers who he felt had been unfairly disciplined. (Hyland Dep. 83). Thus, plaintiffs do not present evidence that the Department failed to discipline similarly situated African–American officers for the same behavior. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir.1997) ("[t]o be 'similarly situated,' the individuals with whom [a plaintiff] attempts to compare [himself] must be similarly situated in all material respects").

Likewise, plaintiffs' assertion that Groves, an African–American officer, and Middleton were allowed to return early from suspension does not constitute evidence of disparate treatment unless plain-

tiffs can show that Caucasian officers in similar circumstances were not permitted to return early. No such evidence has been presented, and plaintiffs admit to lacking knowledge of disciplinary incidents involving any other members of the Department. (*Id.*).

### ii. *Hostile Treatment*

Plaintiffs allege hostile treatment by their African–American superiors, and that their superiors schemed to replace them with African–American officers. These contentions are unsubstantiated.

First, plaintiffs cite Raynor DeRizzio's statement that Tullo would never become Commissioner because the decision-makers "did not want another white boss of the police department." (Tullo Dep. at 115). DeRizzio's statement, however, is inadmissible; no factual basis is provided and the statement appears to be pure speculation on the part of DeRizzio as to what others were thinking. Such speculation does not constitute evidence of discriminatory intent. *Goenaga v. March of Dimes*, 51 F.3d 14 at 19 (2d Cir.1995)

Second, plaintiffs testified that after DeRizzio left, they felt that African–American Deputy Commissioners Edwards, Logan, and Worrell treated them with hostility. (Tullo Dep. at 49, Ex. D., Hyland Dep. at 68). Plaintiffs also asserted that Burrell was hired to replace them, and that DuBose, Edwards, and others planned to force them out of the Department. (Tullo Dep. at 52–53). In addition, Hyland testified that when Tullo took a leave of absence, the Department appointed Deputy Commissioner Logan as interim Chief rather than Hyland, because of his race. (Hyland Dep. at 114).

These contentions are conclusory and lack evidentiary support. In fact, Burrell never replaced plaintiffs, and left the Department in 1999 after only one year. Moreover, plaintiffs themselves acknowl-

edge the lack of factual support for their assertions. Hyland testified that his suspicion as to Burrell and Logan "was just a feeling." (Hyland Dep. at 75, 114). Plaintiffs' conclusory assertions relying on "feelings" of racial animus are not "sufficient to permit the factfinder to infer that [the discriminatory] attitude was more likely than not a motivating factor in the employer's decision." *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992).

### iii. *Deviation from Department Procedures*

Finally, plaintiffs assert that defendants' failure to allow them additional time to respond and to cross-examine Middleton conflicts with Department procedures for investigating complaints. (Tullo Dep. at 79). Furthermore, they assert that defendants mischaracterized Edwards's June 28 letter as containing a direct order that they reply by July 7, 2000. (Edwards Aff. Ex. 13, Letter from Colihan to DuBose dated July 27, 2000). To demonstrate racial animus, however, plaintiffs must show that defendants deviated from procedure because of plaintiffs' race. They have not done so. They admit that they know of no African–American officers who, in circumstances similar to theirs, were suspended or fired. (Tullo Dep. at 118).

### e. *Pretext*

Finally, plaintiffs argue that defendants' stated reasons for suspending them are pretextual. In support of this contention, plaintiffs seek to demonstrate that the investigation into Middleton's allegations took place in an expedited fashion; that Edwards did not order them to respond by July 7; that they were not required to

surrender their badges; and that Department procedures did not require them to testify in response to all the allegations in the complaint. I discuss these contentions below.

### 2. *Defendant's Evidence*

Defendants maintain that they suspended and ultimately dismissed plaintiffs not because of their race, but because they impeded the investigation into Middleton's allegations by failing to comply with Department orders; failed to respond to all of Middleton's allegations; and failed to return their badges and identification cards. (Edwards Aff. ¶¶ 6, 15–16). Defendants have presented substantial evidence to support these contentions, and they point to the following undisputed facts:

— The Department received serious allegations, in writing, from an auxiliary police officer that Tullo and Hyland had threatened him with physical violence and racially harassed him;

— The Department asked Tullo and Hyland for a written response but they did not respond in a timely manner;

— Tullo and Hyland did not ask for an extension of time but instead they unilaterally informed the Department that they would respond by July 28, 2000, three weeks after the original date;[7]

— They did not respond even by that date other than to have their attorney write a letter "categorically denying" the allegations, without making any effort to specifically respond to the allegations;

---

**7.** Plaintiffs' unilateral enlargement of the time to respond was tantamount to insubordination and offended Edwards's and DuBose's sense of Department hierarchy. (Edwards Aff. at ¶¶ 21, 22). *See Morris v. City of New York*, 153 F.Supp.2d 494, 503 (S.D.N.Y.2001)

(citing *Baron v. Meloni*, 556 F.Supp. 796, 799–800 (W.D.N.Y.1983) ("By their very nature, police ... departments require discipline and obedience to commands of departmental hierarchy."), *aff'd*, 779 F.2d 36 (2d Cir.1985)).

— The Department sought to interview Tullo and Hyland about Middleton's allegations, but Tullo and Hyland never made themselves available for an interview; although interviews were scheduled they were delayed at their counsel's request; when the parties met for what the Department intended to be interviews of Tullo and Hyland, they appeared with their lawyer, a stenographer, and a witness, and the lawyer refused to let Tullo and Hyland be interviewed or examined; instead, he gave a "general denial" on their behalf and examined the witness;

— The witness addressed only one of the four incidents that Middleton had complained of and although the witness testified that Tullo and Hyland had not used any racial epithets he also testified that Tullo had said to Middleton "[y]ou do stupid shit";

— At the time of their dismissal, although some five months had gone by since the allegations of serious misconduct had been made against them, Tullo and Hyland still had not provided any response other than to have their attorney make a conclusory "general denial"; and

— Although they were asked to return their Department shields after they were suspended (as Department regulations required), Tullo and Hyland never did so.[8]

These facts are undisputed and they provide substantial support for defendants' contention that they dismissed plaintiffs for legitimate, non-discriminatory reasons.

### 3. *The Record as a Whole*

Considering the evidence as a whole, and resolving all conflicts in the evidence and drawing all reasonable inferences in plaintiffs' favor, I conclude that no reasonable jury could find that plaintiffs were disciplined because of their race.

Plaintiffs have not presented sufficient evidence from which a rational jury could conclude that their suspension and discharge were motivated by racial animus. In the end, plaintiffs' admissible evidence of discrimination is extremely thin: they are white, they were replaced by black officers, and none of the seventeen members of the Mount Vernon auxiliary police force is white when several years ago five of seventeen were white. But plaintiffs are obliged to provide more than "some" evidence of discrimination; they are required to present sufficient evidence to support a finding by a reasonable jury that they were suspended and dismissed because of their race. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996) (to defeat summary judgment, plaintiff is obliged not just to produce "some" evidence, but she must produce sufficient evidence to support a rational jury verdict in her favor). They have not met their burden.

The critical issue here is pretext: could a reasonable jury find that defendants' articulated reasons for suspending and discharging plaintiffs are a pretext for racial discrimination? I conclude that a reasonable jury could not.

Plaintiffs argue that genuine issues of fact exist for trial as to pretext because

---

8. Plaintiffs assert that they were not required to return their badges because they had paid half the cost of having them made. Plaintiffs also testified, however, that when a subordinate officer took leave or was suspended, they took custody of his badge and identification. (Tullo Dep. at 32, 37). In light of the Department regulations requiring the return of badges and identification cards and defendants' testimony, no reasonable jury could find that plaintiffs were not required to return these items. They apparently returned their identification cards, although it is not clear when they did so.

defendants gave them an extremely short period of time to respond; the request for a response was not worded as an order but was merely a request; they were not provided with a hearing before they were dismissed; the Department regulations did not require them to testify; and they paid for half of the cost of their Department shields themselves. These assertions do not create a genuine issue for trial, however, in light of the record as a whole.

The facts are largely undisputed. A subordinate officer made serious allegations against plaintiffs, including allegations that they used racial epithets and threatened him with violence. Whether the allegations would have been sustained after a full investigation is unclear, but it is clear that the allegations were not frivolous: plaintiff's witness testified that Tullo told Middleton "[y]ou do stupid shit" and Tullo admitted at his deposition that he threatened to punch Middleton and to fire him. The Department was justified in treating the allegations as serious ones that warranted expedited treatment. The Department's decision to request a response in nine days—including a holiday—was not unreasonable. Moreover, even assuming the letter was a "request" and not an "order," plaintiffs should have responded: they could have simply denied the allegations in a general fashion and *asked* for additional time to provide a more detailed response. Instead, they unilaterally stated that they would respond three weeks later.

In the end, they never provided a meaningful response. Months went by, and their only response was a "general denial" offered by their attorney. They were not required to "testify," but they were required to submit to an interview about the allegations against them. Their failure to do so surely was cause for their dismissal. *See Allen v. Cabrini Nursing Home, Inc.,* 198 F.Supp.2d 442, 451 (S.D.N.Y.2002)

(plaintiff's refusal to cooperate in investigation into her misconduct, by refusing to give statement to her supervisor, was legitimate, non-pretextual reason for her dismissal). As for their assertion of an entitlement to a hearing, the Department regulations do not provide an auxiliary police officer with such an entitlement. Nor does the case law recognize such a right as a matter of due process. Plaintiffs simply did not have a right to a hearing and the failure of the Department to grant them a hearing is no evidence of pretext.

Finally, although the actions of plaintiffs' attorney might have been well-intended, they severely disrupted the Department's decision-making process. *See O'Dell v. Trans World Entm't Corp.,* 153 F.Supp.2d 378, 389 (S.D.N.Y.2001) (holding that it was "patently unreasonable" for employee who complained that she had been sexually harassed to refuse to participate in employer's investigation, even where refusal was on advice of her attorney). As the Department was trying to investigate a complaint of a threat of violence and the use of racial epithets, it was confronted by a lawyer who refused to let his clients be interviewed, who converted what was supposed to be an interview of his clients into an examination of a witness before a stenographer. More significantly, the investigatory process was delayed and in the end the Department was never able to obtain a meaningful response to the charges that two high-ranking officers had threatened a subordinate officer with violence and had made racist remarks. *See Matima v. Celli,* 228 F.3d 68, 80–81 (2d Cir.2000) (employee's disruptive behavior interfering with internal investigation of discrimination complaint was legitimate ground for dismissal). As the Second Circuit held in *Matima:*

An employer does not violate Title VII when it takes adverse action against an employee to preserve a workplace envi-

ronment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise.

*Id.* at 79.

Accordingly, a reasonable jury could only find that plaintiffs were dismissed for legitimate, non-discriminatory reasons.

### CONCLUSION

Defendant's motion for summary judgment is granted. The complaints are dismissed, with prejudice and with costs but not attorneys' fees.

SO ORDERED.